(Slip Opinion) OCTOBER TERM, 2018 1

Syllabus

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## MITCHELL *v.* WISCONSIN

### CERTIORARI TO THE SUPREME COURT OF WISCONSIN

No. 18–6210. Argued April 23, 2019—Decided June 27, 2019

Petitioner Gerald Mitchell was arrested for operating a vehicle while intoxicated after a preliminary breath test registered a blood alcohol concentration (BAC) that was triple Wisconsin's legal limit for driving. As is standard practice, the arresting officer drove Mitchell to a police station for a more reliable breath test using evidence-grade equipment. By the time Mitchell reached the station, he was too lethargic for a breath test, so the officer drove him to a nearby hospital for a blood test. Mitchell was unconscious by the time he arrived at the hospital, but his blood was drawn anyway under a state law that presumes that a person incapable of withdrawing implied consent to BAC testing has not done so. The blood analysis showed Mitchell's BAC to be above the legal limit, and he was charged with violating two drunk-driving laws. Mitchell moved to suppress the results of the blood test on the ground that it violated his Fourth Amendment right against "unreasonable searches" because it was conducted without a warrant. The trial court denied the motion, and Mitchell was convicted. On certification from the intermediate appellate court, the Wisconsin Supreme Court affirmed the lawfulness of Mitchell's blood test.

*Held*: The judgment is vacated, and the case is remanded.

2018 WI 84, 383 Wis. 2d 192, 914 N. W. 2d 151, vacated and remanded.

JUSTICE ALITO, joined by THE CHIEF JUSTICE, JUSTICE BREYER, and JUSTICE KAVANAUGH, concluded that when a driver is unconscious and cannot be given a breath test, the exigent-circumstances doctrine generally permits a blood test without a warrant. Pp. 5–17.

(a) BAC tests are Fourth Amendment searches. See *Birchfield* v. *North Dakota*, 579 U. S. ___, ___. A warrant is normally required for a lawful search, but there are well-defined exceptions to this rule, including the "exigent circumstances" exception, which allows warrant-

less searches "to prevent the imminent destruction of evidence." *Missouri* v. *McNeely*, 569 U. S. 141, 149. In *McNeely*, this Court held that the fleeting nature of blood-alcohol evidence alone was not enough to bring BAC testing within the exigency exception. *Id.*, at 156. But in *Schmerber* v. *California*, 384 U. S. 757, the dissipation of BAC did justify a blood test of a drunk driver whose accident gave police other pressing duties, for then the *further* delay caused by a warrant application would indeed have threatened the destruction of evidence. Like *Schmerber*, unconscious-driver cases will involve a heightened degree of urgency for several reasons. And when the driver's stupor or unconsciousness deprives officials of a reasonable opportunity to administer a breath test using evidence-grade equipment, a blood test will be essential for achieving the goals of BAC testing. Pp. 5–7.

   (b) Under the exigent circumstances exception, a warrantless search is allowed when "'there is compelling need for official action and no time to secure a warrant.'" *McNeely*, 569 U. S., at 149. Pp. 7–16.

      (1) There is clearly a "compelling need" for a blood test of drunk-driving suspects whose condition deprives officials of a reasonable opportunity to conduct a breath test. First, highway safety is a vital public interest—a "compelling" and "paramount" interest, *Mackey* v. *Montrym*, 443 U. S. 1, 17–18. Second, when it comes to promoting that interest, federal and state lawmakers have long been convinced that legal limits on a driver's BAC make a big difference. And there is good reason to think that such laws have worked. *Birchfield*, 579 U. S., at ___. Third, enforcing BAC limits obviously requires a test that is accurate enough to stand up in court. *Id.*, at ___. And such testing must be prompt because it is "a biological certainty" that "[a]lcohol dissipates from the bloodstream," "literally disappearing by the minute." *McNeely*, 569 U. S., at 169 (ROBERTS, C. J., concurring). Finally, when a breath test is unavailable to promote the interests served by legal BAC limits, "a blood draw becomes necessary." *Id.*, at 170. Pp. 9–12.

      (2) *Schmerber* demonstrates that an exigency exists when (1) BAC evidence is dissipating and (2) some other factor creates pressing health, safety, or law enforcement needs that would take priority over a warrant application. Because both conditions are met when a drunk-driving suspect is unconscious, *Schmerber* controls. A driver's unconsciousness does not just create pressing needs; it is *itself* a medical emergency. In such a case, as in *Schmerber*, an officer could "reasonably have believed that he was confronted with an emergency." 384 U. S., at 771. And in many unconscious-driver cases, the exigency will be *especially* acute. A driver so drunk as to lose con-

Syllabus

sciousness is quite likely to crash, giving officers a slew of urgent tasks beyond that of securing medical care for the suspect—tasks that would require them to put off applying for a warrant. The time needed to secure a warrant may have shrunk over the years, but it has not disappeared; and forcing police to put off other urgent tasks for even a relatively short period of time may have terrible collateral costs. Pp. 12–16.

(c) On remand, Mitchell may attempt to show that his was an unusual case, in which his blood would not have been drawn had police not been seeking BAC information and police could not have reasonably judged that a warrant application would interfere with other pressing needs or duties. Pp. 16–17.

JUSTICE THOMAS would apply a *per se* rule, under which the natural metabolization of alcohol in the blood stream "creates an exigency once police have probable cause to believe the driver is drunk," regardless of whether the driver is conscious. *Missouri* v. *McNeely*, 569 U. S. 141, 178 (THOMAS, J., dissenting). Pp. 1–4.

ALITO, J., announced the judgment of the Court and delivered an opinion, in which ROBERTS, C. J., and BREYER and KAVANAUGH, JJ., joined. THOMAS, J., filed an opinion concurring in the judgment. SOTOMAYOR, J., filed a dissenting opinion, in which GINSBURG and KAGAN, JJ., joined. GORSUCH, J., filed a dissenting opinion.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

—————

No. 18–6210

—————

## GERALD P. MITCHELL, PETITIONER *v.* WISCONSIN

ON WRIT OF CERTIORARI TO THE SUPREME COURT OF WISCONSIN

[June 27, 2019]

JUSTICE ALITO announced the judgment of the Court and delivered an opinion, in which THE CHIEF JUSTICE, JUSTICE BREYER, and JUSTICE KAVANAUGH join.

In this case, we return to a topic that we have addressed twice in recent years: the circumstances under which a police officer may administer a warrantless blood alcohol concentration (BAC) test to a motorist who appears to have been driving under the influence of alcohol. We have previously addressed what officers may do in two broad categories of cases. First, an officer may conduct a BAC test if the facts of a particular case bring it within the exigent-circumstances exception to the Fourth Amendment's general requirement of a warrant. Second, if an officer has probable cause to arrest a motorist for drunk driving, the officer may conduct a breath test (but not a blood test) under the rule allowing warrantless searches of a person incident to arrest.

Today, we consider what police officers may do in a narrow but important category of cases: those in which the driver is unconscious and therefore cannot be given a breath test. In such cases, we hold, the exigent-circumstances rule almost always permits a blood test

without a warrant. When a breath test is impossible, enforcement of the drunk-driving laws depends upon the administration of a blood test. And when a police officer encounters an unconscious driver, it is very likely that the driver would be taken to an emergency room and that his blood would be drawn for diagnostic purposes even if the police were not seeking BAC information. In addition, police officers most frequently come upon unconscious drivers when they report to the scene of an accident, and under those circumstances, the officers' many responsibilities—such as attending to other injured drivers or passengers and preventing further accidents—may be incompatible with the procedures that would be required to obtain a warrant. Thus, when a driver is unconscious, the general rule is that a warrant is not needed.

## I
## A

In *Birchfield* v. *North Dakota*, 579 U. S. ___ (2016), we recounted the country's efforts over the years to address the terrible problem of drunk driving. Today, "all States have laws that prohibit motorists from driving with a [BAC] that exceeds a specified level." *Id.*, at ___ (slip op., at 2). And to help enforce BAC limits, every State has passed what are popularly called implied-consent laws. *Ibid.* As "a condition of the privilege of" using the public roads, these laws require that drivers submit to BAC testing "when there is sufficient reason to believe they are violating the State's drunk-driving laws." *Id.*, at ___, ___ (slip op., at 2, 6).

Wisconsin's implied-consent law is much like those of the other 49 States and the District of Columbia. It deems drivers to have consented to breath or blood tests if an officer has reason to believe they have committed one of

several drug- or alcohol-related offenses.[1]  See Wis. Stat. §§343.305(2), (3).  Officers seeking to conduct a BAC test must read aloud a statement declaring their intent to administer the test and advising drivers of their options and the implications of their choice.  §343.305(4).  If a driver's BAC level proves too high, his license will be suspended; but if he refuses testing, his license will be *revoked* and his refusal may be used against him in court.  See *ibid.*  No test will be administered if a driver refuses— or, as the State would put it, "withdraws" his statutorily presumed consent.  But "[a] person who is unconscious or otherwise not capable of withdrawing consent is presumed not to have" withdrawn it.  §343.305(3)(b).  See also §§343.305(3)(ar)1–2.  More than half the States have provisions like this one regarding unconscious drivers.

## B

The sequence of events that gave rise to this case began when Officer Alexander Jaeger of the Sheboygan Police Department received a report that petitioner Gerald Mitchell, appearing to be very drunk, had climbed into a van and driven off.  Jaeger soon found Mitchell wandering near a lake.  Stumbling and slurring his words, Mitchell could hardly stand without the support of two officers.  Jaeger judged a field sobriety test hopeless, if not danger- ous, and gave Mitchell a preliminary breath test.  It regis- tered a BAC level of 0.24%, triple the legal limit for driv- ing in Wisconsin.  Jaeger arrested Mitchell for operating a

---

[1] Wisconsin also authorizes BAC testing of drivers involved in acci- dents that cause significant bodily harm, with or without probable cause of drunk driving.  See Wis. Stat. §343.305(3)2 (2016).  We do not address those provisions.  And while Wisconsin's and other implied- consent laws permit urine tests, those tests are less common, see *Birchfield* v. *North Dakota*, 579 U. S. \_\_\_, \_\_\_, n. 1 (2016) (slip op., at 6, n. 1), and we do not consider them here.

vehicle while intoxicated and, as is standard practice, drove him to a police station for a more reliable breath test using better equipment.

On the way, Mitchell's condition continued to deteriorate—so much so that by the time the squad car had reached the station, he was too lethargic even for a breath test. Jaeger therefore drove Mitchell to a nearby hospital for a blood test; Mitchell lost consciousness on the ride over and had to be wheeled in. Even so, Jaeger read aloud to a slumped Mitchell the standard statement giving drivers a chance to refuse BAC testing. Hearing no response, Jaeger asked hospital staff to draw a blood sample. Mitchell remained unconscious while the sample was taken, and analysis of his blood showed that his BAC, about 90 minutes after his arrest, was 0.222%.

Mitchell was charged with violating two related drunk-driving provisions. See §§346.63(1)(a), (b). He moved to suppress the results of the blood test on the ground that it violated his Fourth Amendment right against "unreasonable searches" because it was conducted without a warrant. Wisconsin chose to rest its response on the notion that its implied-consent law (together with Mitchell's free choice to drive on its highways) rendered the blood test a consensual one, thus curing any Fourth Amendment problem. In the end, the trial court denied Mitchell's motion to suppress, and a jury found him guilty of the charged offenses. The intermediate appellate court certified two questions to the Wisconsin Supreme Court: first, whether compliance with the State's implied-consent law was sufficient to show that Mitchell's test was consistent with the Fourth Amendment and, second, whether a warrantless blood draw from an unconscious person violates the Fourth Amendment. See 2018 WI 84, ¶15, 383 Wis. 2d 192, 202–203, 914 N. W. 2d 151, 155–156 (2018). The Wisconsin Supreme Court affirmed Mitchell's convictions, and we granted certiorari, 586 U. S. ___ (2019), to decide "[w]hether a statute author-

izing a blood draw from an unconscious motorist provides an exception to the Fourth Amendment warrant requirement," Pet. for Cert. ii.

## II

In considering Wisconsin's implied-consent law, we do not write on a blank slate. "Our prior opinions have referred approvingly to the general concept of implied-consent laws that impose civil penalties and evidentiary consequences on motorists who refuse to comply." *Birchfield*, 579 U. S., at ___ (slip op., at 36). But our decisions have not rested on the idea that these laws do what their popular name might seem to suggest—that is, create actual consent to all the searches they authorize. Instead, we have based our decisions on the precedent regarding the specific constitutional claims in each case, while keeping in mind the wider regulatory scheme developed over the years to combat drunk driving. That scheme is centered on legally specified BAC limits for drivers—limits enforced by the BAC tests promoted by implied-consent laws.

Over the last 50 years, we have approved many of the defining elements of this scheme. We have held that forcing drunk-driving suspects to undergo a blood test does not violate their constitutional right against self-incrimination. See *Schmerber* v. *California*, 384 U. S. 757, 765 (1966). Nor does using their refusal against them in court. See *South Dakota* v. *Neville*, 459 U. S. 553, 563 (1983). And punishing that refusal with automatic license revocation does not violate drivers' due process rights if they have been arrested upon probable cause, *Mackey* v. *Montrym*, 443 U. S. 1 (1979); on the contrary, this kind of summary penalty is "unquestionably legitimate." *Neville, supra*, at 560.

These cases generally concerned the Fifth and Fourteenth Amendments, but motorists charged with drunk

driving have also invoked the Fourth Amendment's ban on "unreasonable searches" since BAC tests are "searches." See *Birchfield*, 579 U. S., at ___ (slip op., at 14). Though our precedent normally requires a warrant for a lawful search, there are well-defined exceptions to this rule. In *Birchfield*, we applied precedent on the "search-incident-to-arrest" exception to BAC testing of conscious drunk-driving suspects. We held that their drunk-driving arrests, taken alone, justify warrantless breath tests but not blood tests, since breath tests are less intrusive, just as informative, and (in the case of conscious suspects) readily available. *Id.,* at ___ (slip op., at 35).

We have also reviewed BAC tests under the "exigent circumstances" exception—which, as noted, allows warrantless searches "to prevent the imminent destruction of evidence." *Missouri* v. *McNeely*, 569 U. S. 141, 149 (2013). In *McNeely*, we were asked if this exception covers BAC testing of drunk-driving suspects in light of the fact that blood-alcohol evidence is always dissipating due to "natural metabolic processes." *Id.*, at 152. We answered that the fleeting quality of BAC evidence alone is not enough. *Id.*, at 156. But in *Schmerber* it *did* justify a blood test of a drunk driver who had gotten into a car accident that gave police other pressing duties, for then the "*further* delay" caused by a warrant application really "*would* have threatened the destruction of evidence." *McNeely*, *supra*, at 152 (emphasis added).

Like *Schmerber*, this case sits much higher than *McNeely* on the exigency spectrum. *McNeely* was about the minimum degree of urgency common to all drunk-driving cases. In *Schmerber*, a car accident heightened that urgency. And here Mitchell's medical condition did just the same.

Mitchell's stupor and eventual unconsciousness also deprived officials of a reasonable opportunity to administer a breath test. To be sure, Officer Jaeger managed to

conduct "a preliminary breath test" using a portable machine when he first encountered Mitchell at the lake. App. to Pet. for Cert. 60a. But he had no reasonable opportunity to give Mitchell a breath test using "evidence-grade breath testing machinery." *Birchfield*, 579 U. S., at \_\_\_ (SOTOMAYOR, J., concurring in part and dissenting in part) (slip op., at 10). As a result, it was reasonable for Jaeger to seek a better breath test at the station; he acted with reasonable dispatch to procure one; and when Mitchell's condition got in the way, it was reasonable for Jaeger to pursue a blood test. As JUSTICE SOTOMAYOR explained in her partial dissent in *Birchfield*:

> "There is a common misconception that breath tests are conducted roadside, immediately after a driver is arrested. While some preliminary testing is conducted roadside, reliability concerns with roadside tests confine their use in most circumstances to establishing probable cause for an arrest. . . . The standard evidentiary breath test is conducted after a motorist is arrested and transported to a police station, governmental building, or mobile testing facility where officers can access reliable, evidence-grade breath testing machinery." *Id.,* at \_\_\_ (slip op., at 10).

Because the "standard evidentiary breath test is conducted after a motorist is arrested and transported to a police station" or another appropriate facility, *ibid.*, the important question here is what officers may do when a driver's unconsciousness (or stupor) eliminates any reasonable opportunity for *that* kind of breath test.

## III

The Fourth Amendment guards the "right of the people to be secure in their persons . . . against unreasonable searches" and provides that "no Warrants shall issue, but upon probable cause." A blood draw is a search of the

person, so we must determine if its administration here without a warrant was reasonable. See *Birchfield*, 579 U. S. at ___ (slip op., at 14). Though we have held that a warrant is normally required, we have also "made it clear that there are exceptions to the warrant requirement." *Illinois* v. *McArthur*, 531 U. S. 326, 330 (2001). And under the exception for exigent circumstances, a warrantless search is allowed when "'there is compelling need for official action and no time to secure a warrant.'" *McNeely*, *supra*, at 149 (quoting *Michigan* v. *Tyler*, 436 U. S. 499, 509 (1978)). In *McNeely*, we considered how the exigent-circumstances exception applies to the broad category of cases in which a police officer has probable cause to believe that a motorist was driving under the influence of alcohol, and we do not revisit that question. Nor do we settle whether the exigent-circumstances exception covers the specific facts of this case.[2] Instead, we address how

─────────

[2] JUSTICE SOTOMAYOR's dissent argues that Wisconsin waived the argument that we now adopt, but the dissent paints a misleading picture of both the proceedings below and the ground for our decision.

First, as to the proceedings below, the dissent contends that the sole question certified to the Wisconsin Supreme Court was "'whether the warrantless blood draw of an unconscious motorist pursuant to Wisconsin's implied consent law, where no exigent circumstances exist or have been argued, violates the Fourth Amendment.'" *Post*, at 3 (quoting App. 61). That is indeed how the intermediate appellate court understood the issue in the case, but the State Supreme Court took a broader view, as was its right. It regarded the appeal as presenting two questions, one of which was "whether a warrantless blood draw from an unconscious person pursuant to Wis. Stat. §343.305(3)(b) violates the Fourth Amendment." See 383 Wis. 2d 192, 202–203, 914 N. W. 2d 151,155–156 (2018). This broad question easily encompasses the rationale that we adopt today.

Second, after noting that the State did not attempt below to make a case-specific showing of exigent circumstances, the dissent claims that our decision is based on this very ground. But that is not at all the basis for our decision. We do not hold that the State established that the facts of this particular case involve exigent circumstances under

the exception bears on the category of cases encompassed by the question on which we granted certiorari—those involving unconscious drivers.[3]  In those cases, the need for a blood test is compelling, and an officer's duty to attend to more pressing needs may leave no time to seek a warrant.

## A

The importance of the needs served by BAC testing is hard to overstate.  The bottom line is that BAC tests are needed for enforcing laws that save lives.  The specifics, in short, are these: Highway safety is critical; it is served by laws that criminalize driving with a certain BAC level;

_____

*McNeely*.  Rather, we adopt a rule for an entire category of cases— those in which a motorist believed to have driven under the influence of alcohol is unconscious and thus cannot be given a breath test.  This rule is not based on what happened in petitioner's particular case but on the circumstances generally present in cases that fall within the scope of the rule.  Those are just the sorts of features of unconscious-driver cases that Wisconsin brought to our attention, see Brief for Respondent 54–55; Tr. of Oral Arg. at 32–34, 48–51, which petitioner addressed, see Reply Brief at 14–15; Tr. of Oral Arg. at 15–20, 23–24, 29–31, 63–66. So it is entirely proper for us to decide the case on this ground.  See *Thigpen* v. *Roberts*, 468 U. S. 27, 29–30 (1984).

[3]While our exigent-circumstances precedent requires a "'totality of the circumstances'" analysis, "the circumstances in drunk driving cases are often typical, and the Court should be able to offer guidance on how police should handle cases like the one before us."  *McNeely*, 569 U. S., at 166 (ROBERTS, C. J., concurring in part and dissenting in part). Indeed, our exigency case law is full of general rules providing such guidance.  Thus, we allow police to proceed without a warrant when an occupant of a home requires "emergency assistance," *Brigham City* v. *Stuart,* 547 U. S. 398, 403 (2006); when a building is on fire, see *Michigan* v. *Tyler,* 436 U. S. 499, 509 (1978); and when an armed robber has just entered a home, see *United States* v. *Santana,* 427 U. S. 38 (1976).  "In each of these cases, the requirement that we base our decision on the 'totality of the circumstances' has not prevented us from spelling out a general rule for the police to follow."  *McNeely*, *supra*, at 168 (opinion of ROBERTS, C. J.).  Neither does it prevent us here.

and enforcing these legal BAC limits requires efficient testing to obtain BAC evidence, which naturally dissipates. So BAC tests are crucial links in a chain on which vital interests hang. And when a breath test is unavailable to advance those aims, a blood test becomes essential. Here we add a word about each of these points.

*First*, highway safety is a vital public interest. For decades, we have strained our vocal chords to give adequate expression to the stakes. We have called highway safety a "compelling interest," *Mackey*, 443 U. S., at 19; we have called it "paramount," *id.*, at 17. Twice we have referred to the effects of irresponsible driving as "slaughter" comparable to the ravages of war. *Breithaupt* v. *Abram*, 352 U. S. 432, 439 (1957); *Perez* v. *Campbell*, 402 U. S. 637, 657, 672 (1971) (Blackmun, J., concurring in result in part and dissenting in part). We have spoken of "carnage," *Neville*, 459 U. S., at 558–559, and even "frightful carnage," *Tate* v. *Short*, 401 U. S. 395, 401 (1971) (Blackmun, J., concurring). The frequency of preventable collisions, we have said, is "tragic," *Neville*, *supra*, at 558, and "astounding," *Breithaupt*, *supra*, at 439. And behind this fervent language lie chilling figures, all captured in the fact that from 1982 to 2016, alcohol-related accidents took roughly 10,000 to 20,000 lives in this Nation *every single year*. See National Highway Traffic Safety Admin. (NHTSA), Traffic Safety Facts 2016, p. 40 (May 2018). In the best years, that would add up to more than one fatality per hour.

*Second*, when it comes to fighting these harms and promoting highway safety, federal and state lawmakers have long been convinced that specified BAC limits make a big difference. States resorted to these limits when earlier laws that included no "statistical definition of intoxication" proved ineffectual or hard to enforce. See *Birchfield*, 579 U. S., at ___–___ (slip op., at 2–3). The maximum permissible BAC, initially set at 0.15%, was

first lowered to 0.10% and then to 0.08%. *Id.*, at \_\_\_, \_\_\_– \_\_\_ (slip op., at 3, 6–7). Congress encouraged this process by conditioning the award of federal highway funds on the establishment of a BAC limit of 0.08%, see 23 U. S. C. §163(a); 23 CFR §1225.1 (2012), and every State has adopted this limit.[4] Not only that, many States, including Wisconsin, have passed laws imposing increased penalties for recidivists or for drivers with a BAC level that exceeds a higher threshold. See Wis. Stat. §346.65(2)(am); *Birchfield*, 579 U. S., at \_\_\_ (slip op., at 7).

There is good reason to think this strategy has worked. As we noted in *Birchfield*, these tougher measures corresponded with a dramatic drop in highway deaths and injuries: From the mid-1970's to the mid-1980's, "the number of annual fatalities averaged 25,000; by 2014 . . . , the number had fallen to below 10,000." *Id.*, at \_\_\_ (slip op., at 6).

*Third*, enforcing BAC limits obviously requires a test that is accurate enough to stand up in court, *id.*, at \_\_\_– \_\_\_ (slip op., at 3–5); see also *McNeely*, 569 U. S., at 159– 160 (plurality opinion). And we have recognized that "[e]xtraction of blood samples for testing is a highly effective means of" measuring "the influence of alcohol." *Schmerber*, 384 U. S., at 771.

Enforcement of BAC limits also requires prompt testing because it is "a biological certainty" that "[a]lcohol dissipates from the bloodstream at a rate of 0.01 percent to 0.025 percent per hour. . . . Evidence is literally disappearing by the minute." *McNeely*, 569 U. S., at 169 (opinion of ROBERTS, C. J.). As noted, the ephemeral nature of BAC was "essential to our holding in *Schmerber*," which itself allowed a warrantless blood test for BAC. *Id.*, at 152

--------

[4] See NHTSA, Alcohol and Highway Safety: A Review of the State of Knowledge 167 (DOT HS 811 374, Mar. 2011).

(opinion of the Court).  And even when we later held that the exigent-circumstances exception would not permit a warrantless blood draw in *every* drunk-driving case, we acknowledged that delays in BAC testing can "raise questions about . . . accuracy." *Id.*, at 156.

It is no wonder, then, that the implied-consent laws that incentivize prompt BAC testing have been with us for 65 years and now exist in all 50 States. *Birchfield*, *supra*, at ___ (slip op., at 6).  These laws and the BAC tests they require are tightly linked to a regulatory scheme that serves the most pressing of interests.

Finally, when a breath test is unavailable to promote those interests, "a blood draw becomes necessary." *McNeely*, 569 U. S., at 170 (opinion of ROBERTS, C. J.). Thus, in the case of unconscious drivers, who cannot blow into a breathalyzer, blood tests are essential for achieving the compelling interests described above.

Indeed, not only is the link to pressing interests here tighter; the interests themselves are greater: Drivers who are drunk enough to pass out at the wheel or soon afterward pose a much greater risk.  It would be perverse if the more wanton behavior were rewarded—if the more harrowing threat were harder to punish.

For these reasons, there clearly is a "compelling need" for a blood test of drunk-driving suspects whose condition deprives officials of a reasonable opportunity to conduct a breath test.  *Id.,* at 149 (opinion of the Court) (internal quotation marks omitted).  The only question left, under our exigency doctrine, is whether this compelling need justifies a warrantless search because there is, furthermore, "'no time to secure a warrant.'" *Ibid.*

B

We held that there was no time to secure a warrant before a blood test of a drunk-driving suspect in *Schmerber* because the officer there could "reasonably

have believed that he was confronted with an emergency, in which the delay necessary to obtain a warrant, under the circumstances, threatened the destruction of evidence." 384 U. S., at 770 (internal quotation marks omitted). So even if the constant dissipation of BAC evidence *alone* does not create an exigency, see *McNeely*, *supra*, at 150–151, *Schmerber* shows that it does so when combined with other pressing needs:

> "We are told that [1] the percentage of alcohol in the blood begins to diminish shortly after drinking stops, as the body functions to eliminate it from the system. Particularly in a case such as this, where [2] time had to be taken to bring the accused to a hospital and to investigate the scene of the accident, there was no time to seek out a magistrate and secure a warrant. Given these special facts, we conclude that the attempt to secure evidence of blood-alcohol content in this case [without a warrant] was . . . appropriate . . . ." 384 U. S., at 770–771.

Thus, exigency exists when (1) BAC evidence is dissipating and (2) some other factor creates pressing health, safety, or law enforcement needs that would take priority over a warrant application. Both conditions are met when a drunk-driving suspect is unconscious, so *Schmerber* controls: With such suspects, too, a warrantless blood draw is lawful.

1

In *Schmerber*, the extra factor giving rise to urgent needs that would only add to the delay caused by a warrant application was a car accident; here it is the driver's unconsciousness. Indeed, unconsciousness does not just

 create pressing needs; it is *itself* a medical emergency.[5]  It means that the suspect will have to be rushed to the hospital or similar facility not just for the blood test itself but for urgent medical care.[6]  Police can reasonably anticipate that such a driver might require monitoring, positioning, and support on the way to the hospital;[7] that his blood may be drawn anyway, for diagnostic purposes, immediately on arrival;[8] and that immediate medical treatment could delay (or otherwise distort the results of) a blood draw conducted later, upon receipt of a warrant, thus reducing its evidentiary value.  See *McNeely, supra,* at 156 (plurality opinion).  All of that sets this case apart from

————————

[5] See National Institutes of Health, U. S. National Library of Medicine, MedlinePlus, Unconsciousness (June 3, 2019), https://medlineplus.gov/ency/article/000022.htm (all Internet materials as last visited June 25, 2019).

[6] Limmer et al., Emergency Care 598 (13th ed. 2016).

[7] See *id.,* at 593–594.

[8] See J. Kwasnoski, G. Partridge, & J. Stephen, Officer's DUI Handbook 142 (6th ed. 2013) ("[M]ost hospitals routinely withdraw blood from the driver immediately upon admittance"); see also E. Mitchell & R. Medzon, Introduction to Emergency Medicine 269 (2005) ("Serum glucose and blood alcohol concentrations are two pieces of information that are of paramount importance when an apparently intoxicated patient arrives at the [emergency room]"); Mayo Clinic, Alcohol Poisoning: Diagnosis & Treatment (2019), https://www.mayoclinic.org/diseases-conditions/alcohol-poisoning/diagnosis-treatment/drc-20354392. In this respect, the case for allowing a blood draw is stronger here than in *Schmerber* v. *California,* 384 U. S. 757 (1966).  In the latter, it gave us pause that blood draws involve piercing a person's skin.  See *id.,* at 762, 770.  But since unconscious suspects will often have their skin pierced and blood drawn for diagnostic purposes, allowing law enforcement to use blood taken from that initial piercing would not increase the bodily intrusion.  In fact, dispensing with the warrant rule could *lessen* the intrusion.  It could enable authorities to use blood obtained by hospital staff when the suspect is admitted rather than having to wait to hear back about a warrant and then order what might be a second blood draw.

the uncomplicated drunk-driving scenarios addressed in *McNeely*. Just as the ramifications of a car accident pushed *Schmerber* over the line into exigency, so does the condition of an unconscious driver bring his blood draw under the exception. In such a case, as in *Schmerber*, an officer could "reasonably have believed that he was confronted with an emergency." 384 U. S., at 770.

Indeed, in many unconscious-driver cases, the exigency will be *more* acute, as elaborated in the briefing and argument in this case. A driver so drunk as to lose consciousness is quite likely to crash, especially if he passes out before managing to park. And then the accident might give officers a slew of urgent tasks beyond that of securing (and working around) medical care for the suspect. Police may have to ensure that others who are injured receive prompt medical attention; they may have to provide first aid themselves until medical personnel arrive at the scene. In some cases, they may have to deal with fatalities. They may have to preserve evidence at the scene and block or redirect traffic to prevent further accidents. These pressing matters, too, would require responsible officers to put off applying for a warrant, and that would only exacerbate the delay—and imprecision—of any subsequent BAC test.

In sum, all these rival priorities would put officers, who must often engage in a form of triage, to a dilemma. It would force them to choose between prioritizing a warrant application, to the detriment of critical health and safety needs, and delaying the warrant application, and thus the BAC test, to the detriment of its evidentiary value and all the compelling interests served by BAC limits. This is just the kind of scenario for which the exigency rule was born—just the kind of grim dilemma it lives to dissolve.

2

Mitchell objects that a warrantless search is unnecessary in cases involving unconscious drivers because war-

rants these days can be obtained faster and more easily. But even in our age of rapid communication,

> "[w]arrants inevitably take some time for police officers or prosecutors to complete and for magistrate judges to review. Telephonic and electronic warrants may still require officers to follow time-consuming formalities designed to create an adequate record, such as preparing a duplicate warrant before calling the magistrate judge. . . . And improvements in communications technology do not guarantee that a magistrate judge will be available when an officer needs a warrant after making a late-night arrest." *McNeely*, 569 U. S., at 155.

In other words, with better technology, the time required has shrunk, but it has not disappeared. In the emergency scenarios created by unconscious drivers, forcing police to put off other tasks for even a relatively short period of time may have terrible collateral costs. That is just what it means for these situations to *be* emergencies.

## IV

When police have probable cause to believe a person has committed a drunk-driving offense and the driver's unconsciousness or stupor requires him to be taken to the hospital or similar facility before police have a reasonable opportunity to administer a standard evidentiary breath test, they may almost always order a warrantless blood test to measure the driver's BAC without offending the Fourth Amendment. We do not rule out the possibility that in an unusual case a defendant would be able to show that his blood would not have been drawn if police had not been seeking BAC information, and that police could not have reasonably judged that a warrant application would interfere with other pressing needs or duties. Because Mitchell did not have a chance to attempt to make that

Opinion of ALITO, J.

showing, a remand for that purpose is necessary.

\*      \*      \*

The judgment of the Supreme Court of Wisconsin is vacated, and the case is remanded for further proceedings.

*It is so ordered.*

# SUPREME COURT OF THE UNITED STATES

_____

No. 18–6210

_____

## GERALD P. MITCHELL, PETITIONER *v.* WISCONSIN

ON WRIT OF CERTIORARI TO THE SUPREME COURT OF
WISCONSIN

[June 27, 2019]

JUSTICE THOMAS, concurring in the judgment.

Today, the plurality adopts a difficult-to-administer rule: Exigent circumstances are generally present when police encounter a person suspected of drunk driving—except when they aren't. Compare *ante*, at 13, with *ante*, at 16. The plurality's presumption will rarely be rebutted, but it will nevertheless burden both officers and courts who must attempt to apply it. "The better (and far simpler) way to resolve" this case is to apply "the *per se* rule" I proposed in *Missouri* v. *McNeely*, 569 U. S. 141 (2013) (dissenting opinion). *Birchfield* v. *North Dakota*, 579 U. S. ___, ___ (2016) (THOMAS, J., concurring in judgment in part and dissenting in part) (slip op., at 3). Under that rule, the natural metabolization of alcohol in the blood stream "'creates an exigency once police have probable cause to believe the driver is drunk,'" regardless of whether the driver is conscious. *Id.,* at ___ (slip op., at 4). Because I am of the view that the Wisconsin Supreme Court should apply that rule on remand, I concur only in the judgment.

## I

The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." Although the Fourth Amendment does

not, by its text, require that searches be supported by a warrant, see *Groh* v. *Ramirez*, 540 U. S. 551, 571–573 (2004) (THOMAS, J., dissenting), "this Court has inferred that a warrant must generally be secured" for a search to comply with the Fourth Amendment, *Kentucky* v. *King*, 563 U. S. 452, 459 (2011). We have also recognized, however, that this warrant presumption "may be overcome in some circumstances because '[t]he ultimate touchstone of the Fourth Amendment is "reasonableness."'" *Ibid.* Accordingly, we have held that "the warrant requirement is subject to certain reasonable exceptions." *Ibid.*

In recent years, this Court has twice considered whether warrantless blood draws fall within an exception to the warrant requirement. First, in *McNeely*, a divided court held that the natural metabolization of alcohol in the bloodstream does not present a *per se* exigency that justifies an exception to the Fourth Amendment's warrant requirement. 569 U. S., at 145. Then, in *Birchfield*, we held that blood draws may not be administered as a search incident to a lawful arrest for drunk driving. 579 U. S., at ___ (slip op., at 35). The question we face in this case is whether the blood draw here fell within one of the "reasonable exceptions" to the warrant requirement.

## II

The "exigent circumstances" exception applies when "the needs of law enforcement [are] so compelling that [a] warrantless search is objectively reasonable under the Fourth Amendment." *King*, 563 U. S., at 460 (internal quotation marks omitted). Applying this doctrine, the Court has held that officers may conduct a warrantless search when failure to act would result in "the imminent destruction of evidence." *Ibid.* (internal quotation marks omitted).

As I have explained before, "the imminent destruction of evidence" is a risk in every drunk-driving arrest and thus

"implicates the exigent-circumstances doctrine." *McNeely*, 569 U. S., at 178. "Once police arrest a suspect for drunk driving, each passing minute eliminates probative evidence of the crime" as alcohol dissipates from the bloodstream. *Id.*, at 177. In many States, this "rapid destruction of evidence," *id.*, at 178, is particularly problematic because the penalty for drunk driving depends in part on the driver's blood alcohol concentration, see *ante*, at 11. Because the provisions of Wisconsin law at issue here allow blood draws only when the driver is suspected of impaired driving, *ante*, at 2–3, they fit easily within the exigency exception to the warrant requirement.

Instead of adopting this straightforward rule, the plurality makes a flawed distinction between ordinary drunk-driving cases in which blood alcohol concentration evidence "is dissipating" and those that also include "some other [pressing] factor." *Ante*, at 6, 13, 16. But whether "some other factor creates pressing health, safety, or law-enforcement needs that would take priority over a warrant application" is irrelevant. *Ante*, at 13. When police have probable cause to conclude that an individual was driving drunk, probative evidence is dissipating by the minute. And that evidence dissipates regardless of whether police had another reason to draw the driver's blood or whether "a warrant application would interfere with other pressing needs or duties." *Ante*, at 16. The destruction of evidence alone is sufficient to justify a warrantless search based on exigent circumstances. See generally *McNeely*, 569 U. S., at 176–179 (opinion of THOMAS, J.).

Presumably, the plurality draws these lines to avoid overturning *McNeely*. See *id.*, at 156 (majority opinion) (holding that "the natural dissipation of alcohol in the blood" does not "categorically" support a finding of exigency). But *McNeely* was wrongly decided, see *id.*, at 176–183 (opinion of THOMAS, J.), and our decision in *Birchfield* has already undermined its rationale. Specifically, the Court

determined in *McNeely* that "[t]he context of blood testing is different in critical respects from other destruction-of-evidence cases in which the police are truly confronted with a now or never situation." 569 U. S., at 153 (majority opinion) (internal quotation marks omitted). But the Court stated in *Birchfield* that a distinction between "an arrestee's active destruction of evidence and the loss of evidence due to a natural process makes little sense." 579 U. S., at ___ (slip op., at 31); see also *ante*, at 11–12. Moreover, to the extent *McNeely* was grounded in the belief that a *per se* rule was inconsistent with the "case by case," "totality of the circumstances" analysis ordinarily applied in exigent-circumstances cases, see 569 U. S., at 156, that rationale was suspect from the start. That the exigent-circumstances exception might ordinarily require "an evaluation of the particular facts of each case," *Birchfield*, *supra*, at ___ (slip op., at 32), does not foreclose us from recognizing that a certain, dispositive fact is always present in some categories of cases. In other words, acknowledging that destruction of evidence is at issue in every drunk-driving case does not undermine the general totality-of-the-circumstances approach that *McNeely* and *Birchfield* endorsed. Cf. *ante*, at 9, n. 3.

\* \* \*

The Court has consistently held that police officers may perform searches without a warrant when destruction of evidence is a risk. *United States* v. *Banks*, 540 U. S. 31, 38 (2003); *Richards* v. *Wisconsin*, 520 U. S. 385, 395 (1997); *Cupp* v. *Murphy*, 412 U. S. 291, 295–296 (1973); *Schmerber* v. *California*, 384 U. S. 757, 770–772 (1966). The rule should be no different in drunk-driving cases. Because the plurality instead adopts a rule more likely to confuse than clarify, I concur only in the judgment.

# SUPREME COURT OF THE UNITED STATES

_____

No. 18–6210

_____

## GERALD P. MITCHELL, PETITIONER *v.* WISCONSIN

ON WRIT OF CERTIORARI TO THE SUPREME COURT OF
WISCONSIN

[June 27, 2019]

JUSTICE SOTOMAYOR, with whom JUSTICE GINSBURG
and JUSTICE KAGAN join, dissenting.

The plurality's decision rests on the false premise that
today's holding is necessary to spare law enforcement from
a choice between attending to emergency situations and
securing evidence used to enforce state drunk-driving
laws.  Not so.  To be sure, drunk driving poses significant
dangers that Wisconsin and other States must be able to
curb.  But the question here is narrow: What must police
do before ordering a blood draw of a person suspected of
drunk driving who has become unconscious?  Under the
Fourth Amendment, the answer is clear: If there is time,
get a warrant.

The State of Wisconsin conceded in the state courts that
it had time to get a warrant to draw Gerald Mitchell's
blood, and that should be the end of the matter.  Because
the plurality needlessly casts aside the established protec-
tions of the warrant requirement in favor of a brand new
presumption of exigent circumstances that Wisconsin does
not urge, that the state courts did not consider, and that
contravenes this Court's precedent, I respectfully dissent.

## I

In May 2013, Wisconsin police received a report that
Gerald Mitchell, seemingly intoxicated, had driven away
from his apartment building.  A police officer later found

Mitchell walking near a lake, slurring his speech and walking with difficulty. His van was parked nearby. The officer administered a preliminary breath test, which revealed a blood-alcohol concentration (BAC) of 0.24%. The officer arrested Mitchell for operating a vehicle while intoxicated.

Once at the police station, the officer placed Mitchell in a holding cell, where Mitchell began to drift into either sleep or unconsciousness. At that point, the officer decided against administering a more definitive breath test and instead took Mitchell to the hospital for a blood test. Mitchell became fully unconscious on the way. At the hospital, the officer read Mitchell a notice, required by Wisconsin's so-called "implied consent" law, which gave him the opportunity to refuse BAC testing. See Wis. Stat. §343.305 (2016). But Mitchell was too incapacitated to respond. The officer then asked the hospital to test Mitchell's blood. Mitchell's blood was drawn about 90 minutes after his arrest, and the test revealed a BAC of 0.22%[1] At no point did the officer attempt to secure a warrant.

Mitchell was charged with violating two Wisconsin drunk-driving laws. See §§346.63(1)(a), (b). He moved to suppress the blood-test results, arguing that the warrantless blood draw was an unreasonable search under the Fourth Amendment. In response, Wisconsin conceded that exigent circumstances did not justify the warrantless blood draw. As the State's attorney told the trial court, "There is nothing to suggest that this is a blood draw on a[n] exigent circumstances situation when there has been a concern for exigency. This is not that case." App. 134.

--------

[1] Although the Wisconsin Supreme Court referred to the lapse in time between the arrest and the blood draw as lasting "approximately one hour," App. 11, the state appellate court explained that Mitchell was arrested around 4:26 p.m. and that the blood draw took place at 5:59 p.m., *id.,* at 63–64.

Instead, Wisconsin argued that the warrantless blood draw was lawful because of Wisconsin's implied-consent statute. *Id.,* at 133.

The trial court denied Mitchell's motion to suppress, and a jury convicted him of the charged offenses. On appeal, the State Court of Appeals noted that Wisconsin had "expressly disclaimed that it was relying on exigent circumstances to justify the draw," *id.,* at 64, and that this case offered a chance to clarify the law on implied consent because the case "is not susceptible to resolution on the ground of exigent circumstances," *id.,* at 66. The Court of Appeals then certified the appeal to the Wisconsin Supreme Court, identifying the sole issue on appeal as "whether the warrantless blood draw of an unconscious motorist pursuant to Wisconsin's implied consent law, where no exigent circumstances exist or have been argued, violates the Fourth Amendment." *Id.,* at 61.

On certification from the state appellate court, the Supreme Court of Wisconsin upheld the search.[2] The Court granted certiorari to decide whether a statute like Wisconsin's, which allows police to draw blood from an unconscious drunk-driving suspect, provides an exception to the Fourth Amendment's warrant requirement.

## II

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons . . . against unreasonable searches and seizures." When the aim of a search is to uncover evidence of a crime, the Fourth Amendment generally requires police to obtain a warrant. *Vernonia*

---

[2] The Wisconsin Supreme Court rephrased the certified question, but, like the Court of Appeals, it recognized the State's concession that the exigency exception did not apply and, accordingly, did not consider the issue in reaching its decision. See 2018 WI 84, ¶12, 383 Wis. 2d 192, 202, 914 N. W. 2d 151, 155.

*School Dist. 47J* v. *Acton*, 515 U. S. 646, 653 (1995).

The warrant requirement is not a mere formality; it ensures that necessary judgment calls are made "'by a neutral and detached magistrate,'" not "'by the officer engaged in the often competitive enterprise of ferreting out crime.'" *Schmerber* v. *California*, 384 U. S. 757, 770 (1966). A warrant thus serves as a check against searches that violate the Fourth Amendment by ensuring that a police officer is not made the sole interpreter of the Constitution's protections. Accordingly, a search conducted without a warrant is "*per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions." *Katz* v. *United States*, 389 U. S. 347, 357 (1967) (footnote omitted); see *Riley* v. *California*, 573 U. S. 373, 382 (2014) ("In the absence of a warrant, a search is reasonable only if it falls within a specific exception to the warrant requirement").

The carefully circumscribed exceptions to the warrant requirement, as relevant here, include the exigent-circumstances exception, which applies when "'the exigencies of the situation' make the needs of law enforcement so compelling that [a] warrantless search is objectively reasonable," *Kentucky* v. *King*, 563 U. S. 452, 460 (2011) (some internal quotation marks omitted); the consent exception for cases where voluntary consent is given to the search, see, *e.g., Georgia* v. *Randolph*, 547 U. S. 103, 109 (2006); and the exception for "searches incident to arrest," see, *e.g., Riley*, 573 U. S., at 382.

## A

Blood draws are "searches" under the Fourth Amendment. The act of drawing a person's blood, whether or not he is unconscious, "involve[s] a compelled physical intrusion beneath [the] skin and into [a person's] veins," all for the purpose of extracting evidence for a criminal investigation. *Missouri* v. *McNeely*, 569 U. S. 141, 148 (2013).

The blood draw also "places in the hands of law enforcement authorities a sample that can be preserved and from which it is possible to extract information beyond a simple BAC reading," *Birchfield* v. *North Dakota*, 579 U. S. ___, ___ (2016) (slip op., at 23), such as whether a person is pregnant, is taking certain medications, or suffers from an illness. That "invasion of bodily integrity" disturbs "an individual's 'most personal and deep-rooted expectations of privacy.'" *McNeely*, 569 U. S., at 148.

For decades, this Court has stayed true to the Fourth Amendment's warrant requirement and the narrowness of its exceptions, even in the face of attempts categorically to exempt blood testing from its protections. In *Schmerber*, a man was hospitalized following a car accident. 384 U. S., at 758. At the scene of the accident and later at the hospital, a police officer noticed signs of intoxication, and he arrested Schmerber for drunk driving. *Id.,* at 768–769. Without obtaining a warrant, the officer ordered a blood draw to measure Schmerber's BAC, and Schmerber later challenged the blood test as an unreasonable search under the Fourth Amendment. *Id.,* at 758–759. The Court reinforced that search warrants are "ordinarily required . . . where intrusions into the human body are concerned," *id.,* at 770, but it ultimately held that exigent circumstances justified the particular search at issue because certain "special facts"—namely, an unusual delay caused by the investigation at the scene and the subsequent hospital trip—left the police with "no time to seek out a magistrate and secure a warrant" before losing the evidence. *Id.,* at 770–771.

More recently, in *McNeely*, the Court held that blood tests are not categorically exempt from the warrant requirement, explaining that exigency "must be determined case by case based on the totality of the circumstances." 569 U. S., at 156. "[T]he natural dissipation of alcohol in the blood may support a finding of exigency in a specific

case," but "it does not do so categorically." *Ibid.* If officers "can reasonably obtain a warrant before a blood sample can be drawn without significantly undermining the efficacy of the search," the Court made clear, "the Fourth Amendment mandates that they do so." *Id.,* at 152; see *id.,* at 167 (ROBERTS, C. J., concurring in part and dissenting in part) ("The natural dissipation of alcohol in the bloodstream . . . would qualify as an exigent circumstance, except that there may be time to secure a warrant before blood can be drawn. If there is, an officer must seek a warrant").

In *Birchfield*, the Court rejected another attempt categorically to exempt blood draws from the warrant requirement. 579 U. S., at ___ (slip op., at 33). The Court considered whether warrantless breath and blood tests to determine a person's BAC level were permissible as searches incident to arrest. The Court held that warrantless breath tests were permitted because they are insufficiently intrusive to outweigh the State's need for BAC testing. See *ibid.* As to blood tests, however, the Court held the opposite: Because they are significantly more intrusive than breath tests, the warrant requirement applies unless particular exigent circumstances prevent officers from obtaining a warrant. *Ibid.*; see *id.*, at ___ (slip op., at 34) ("Nothing prevents the police from seeking a warrant for a blood test when there is sufficient time to do so in the particular circumstances or from relying on the exigent circumstances exception . . . when there is not").[3]

_____

[3] The Court in *Birchfield* concluded as much even while acknowledging that, in some cases, the suspect would be unconscious and thus unable to perform a breath test. 579 U. S., at ___ (slip op., at 35) ("It is true that a blood test, unlike a breath test, may be administered to a person who is unconscious (perhaps as a result of a crash) or who is unable to do what is needed to take a breath test due to profound

B

Those cases resolve this one. *Schmerber* and *McNeely* establish that there is no categorical exigency exception for blood draws, although exigent circumstances might justify a warrantless blood draw on the facts of a particular case. And from *Birchfield*, we know that warrantless blood draws cannot be justified as searches incident to arrest. The lesson is straightforward: Unless there is too little time to do so, police officers must get a warrant before ordering a blood draw. See 579 U. S., at \_\_\_ (slip op., at 34); *McNeely*, 569 U. S., at 152.

Against this precedential backdrop, Wisconsin's primary argument has always been that Mitchell consented to the blood draw through the State's "implied-consent law." Under that statute, a motorist who drives on the State's roads is "deemed" to have consented to a blood draw, breath test, and urine test, and that supposed consent allows a warrantless blood draw from an unconscious motorist as long as the police have probable cause to believe that the motorist has violated one of the State's impaired driving statutes. See Wis. Stat. §343.305.

The plurality does not rely on the consent exception here. See *ante*, at 5. With that sliver of the plurality's reasoning I agree. I would go further and hold that the state statute, however phrased, cannot itself create the actual and informed consent that the Fourth Amendment requires. See *Randolph*, 547 U. S., at 109 (describing the "voluntary consent" exception to the warrant requirement as "'jealously and carefully drawn'"); *Bumper* v. *North Carolina*, 391 U. S. 543, 548 (1968) (stating that consent must be "freely and voluntarily given"); see also *Schneck-*

_____

intoxication or injuries. But we have no reason to believe that such situations are common in drunk-driving arrests, and when they arise, the police may apply for a warrant if need be").

*loth* v. *Bustamonte*, 412 U. S. 218, 226–227 (1973) (explaining that the existence of consent must "be determined from the totality of all the circumstances"). That should be the end of this case.

### III

Rather than simply applying this Court's precedents to address—and reject—Wisconsin's implied-consent theory, the plurality today takes the extraordinary step of relying on an issue, exigency, that Wisconsin has affirmatively waived.[4]  Wisconsin has not once, in any of its briefing before this Court or the state courts, argued that exigent circumstances were present here.  In fact, in the state proceedings, Wisconsin "conceded" that the exigency exception does not justify the warrantless blood draw in this case.  App. 66; see 2018 WI 84, ¶12, 383 Wis. 2d 192, 202, 914 N. W. 2d 151, 155 ("The State expressly stated that it was not relying on exigent circumstances to justify the blood draw").  Accordingly, the state courts proceeded on the acknowledgment that no exigency is at issue here.  As the Wisconsin Court of Appeals put it:

> "In particular, this case is not susceptible to resolution on the ground of exigent circumstances.  No testimony was received that would support the conclu-

———————

[4] The plurality criticizes me for supposedly suggesting that today's decision is based on a "case-specific showing of exigent circumstances." *Ante,* at 8, n. 2.  But I acknowledge that the plurality does not go so far as to decide that exigent circumstances justify the search in Mitchell's case, perhaps because the facts here support no such conclusion.  See *infra*, at 16.  Indeed, rather than confine itself to the facts and legal issues actually presented in this case, the plurality instead creates a new *de facto* categorical rule out of thin air.  The plurality does so without any evidence that such a rule is necessary in all, or even most, cases.  See *infra*, at 16–17.  That the plurality reaches out to determine the rights of all drivers, rather than just Mitchell, makes today's decision more misguided, not less.

> sion that exigent circumstances justified the warrant-
> less blood draw. [The officer] expressed agnosticism
> as to how long it would have taken to obtain a war-
> rant, and he never once testified (or even implied)
> that there was no time to get a warrant." App. 66.

The exigency issue is therefore waived—that is, knowingly and intentionally abandoned, see *Wood* v. *Milyard*, 566 U. S. 463, 474 (2012)—and the Court should not have considered it. See, *e.g., Heckler* v. *Campbell*, 461 U. S. 458, 468, n. 12 (1983); cf. *Alabama* v. *Shelton*, 535 U. S. 654, 674 (2002) ("We confine our review to the ruling the Alabama Supreme Court made in the case as presented to it").

Rather than hold Wisconsin to a concession from which it has never wavered, the plurality takes on the waived theory. As "'a court of review, not of first view,'" however, this Court is not in the business of volunteering new rationales neither raised nor addressed below, and even less ones that no party has raised here. *Timbs* v. *Indiana*, 586 U. S. \_\_\_, \_\_\_ (2019) (slip op., at 8); see, *e.g., Star Athletica, L. L. C.* v. *Varsity Brands, Inc.*, 580 U. S. \_\_\_, \_\_\_ (2017) (slip op., at 6); cf. *Kentucky* v. *Stincer*, 482 U. S. 730, 747–748, n. 22 (1987) (declining to review a respondent's previously unraised claim "[b]ecause the judgment [was] that of a state court" and no "exceptional" circumstances were present).

There are good reasons for this restraint. Ensuring that an issue has been fully litigated allows the Court "the benefit of developed arguments on both sides and lower court opinions squarely addressing the question." *Yee* v. *Escondido*, 503 U. S. 519, 538 (1992). It also reflects a central "'premise of our adversarial system'": Courts sit to resolve disputes among the parties, not "'as self-directed boards of legal inquiry and research.'" *Lebron* v. *National Railroad Passenger Corporation*, 513 U. S. 374, 408 (1995)

(O'Connor, J., dissenting) (quoting *Carducci* v. *Regan*, 714 F. 2d 171, 177 (CADC 1983) (Scalia, J.)).

These rules, in other words, beget more informed decisionmaking by the Court and ensure greater fairness to litigants, who cannot be expected to respond pre-emptively to arguments that live only in the minds of the Justices. Cf. *Granite Rock Co.* v. *Teamsters*, 561 U. S. 287, 306, and n. 14 (2010); *Yee*, 503 U. S., at 535–536. These principles should apply with greater force when the issues were not merely forfeited but affirmatively "conceded" below, App. 66, and where, as here, the question is one of constitutional dimension. The plurality acts recklessly in failing to honor these fundamental principles here.[5]

## IV

There are good reasons why Wisconsin never asked any court to consider applying any version of the exigency exception here: This Court's precedents foreclose it. Ac-

---

[5] A related but distinct point: The issue on which the plurality resolves this case is not "fairly included" in the question on which the Court granted certiorari. See this Court's Rule 14.1(a). The Court granted certiorari to answer "[w]hether a statute authorizing a blood draw from an unconscious motorist provides an exception to the Fourth Amendment warrant requirement." Pet. for Cert. ii; accord, *ante*, at 4–5. The answer to that question is no. Whether exigent circumstances nevertheless require that the warrantless blood draw be upheld is an independent issue. True, that issue might affect the same "category of cases," *ante*, at 8, n. 2, but that would be true of all sorts of matters not fairly included in the question on which this Court granted certiorari. "Both [issues] might be subsidiary to a question embracing both—[Was suppression appropriate?]—but they exist side by side, neither encompassing the other." *Yee* v. *Escondido*, 503 U. S. 519, 537 (1992). This Court applies a "heavy presumption against" venturing beyond the question presented, even when the parties ask it to do so. *Ibid.* Here, of course, the plurality ventures forth to provide guidance entirely of its own accord. One wonders why the Court asked for briefing and oral argument at all.

cording to the plurality, when the police attempt to obtain a blood sample from a person suspected of drunk driving, there will "almost always" be exigent circumstances if the person falls unconscious. *Ante,* at 1. As this case demonstrates, however, the fact that a suspect fell unconscious at some point before the blood draw does not mean that there was insufficient time to get a warrant. And if the police have time to secure a warrant before the blood draw, "the Fourth Amendment mandates that they do so." *McNeely,* 569 U. S., at 152. In discarding that rule for its own, the plurality may not "revisit" *McNeely, ante,* at 8, but the plurality does ignore it.

## A

The exigent-circumstances exception to the Fourth Amendment warrant requirement applies if the State can demonstrate a "compelling need for official action and no time to secure a warrant." *Michigan* v. *Tyler*, 436 U. S. 499, 509 (1978); see also *King*, 563 U. S., at 460 (The exception applies "when 'the exigencies of the situation' make the needs of law enforcement so compelling that [a] warrantless search is objectively reasonable" (some internal quotation marks omitted)). The Court has identified exigencies when officers need to enter a home without a warrant to provide assistance to a "seriously injured" occupant or one facing an imminent threat of such injury, *Brigham City* v. *Stuart*, 547 U. S. 398, 403 (2006); when officers are in "hot pursuit" of a fleeing suspect, *United States* v. *Santana*, 427 U. S. 38, 42–43 (1976); and when officers need to enter a burning building to extinguish a fire, *Tyler*, 436 U. S., at 509.

Blood draws implicate a different type of exigency. The Court has "recognized that in some circumstances law enforcement officers may conduct a search without a warrant to prevent the imminent destruction of evidence." *McNeely*, 569 U. S., at 149. To determine whether exigent

circumstances justify a warrantless search, the Court
"looks to the totality of circumstances" in the particular
case. *Ibid.* "The critical point is that . . . the exigent
circumstances exception requires a court to examine
whether an emergency justified a warrantless search in
each particular case." *Riley*, 573 U. S., at 402.

In *McNeely*, Missouri urged the Court to adopt a cate-
gorical rule that the natural dissipation of alcohol from a
person's bloodstream will always create exigent circum-
stances that allow police officers to order a blood draw
without obtaining a warrant. 569 U. S., at 149–150. The
Court declined. Even though the gradual dissipation of a
person's BAC means that "a significant delay in testing
will negatively affect the probative value" of a blood test,
eight Justices hewed to the traditional, "case-by-case
assessment of exigency," given that police will at least in
some instances have time to get a warrant. *Id.*, at 152; see
*id.,* at 166–167 (opinion of ROBERTS, C. J.); *id.,* at 175
("The majority answers 'It depends,' and so do I").

In that way, cases involving blood draws are "different
in critical respects" from the typical destruction-of-
evidence case that presents police officers with a """"now or
never"""" situation. *Id.,* at 153 (opinion of the Court).
Unlike situations in which "police are just outside the door
to a home" and "evidence is about to be destroyed, a per-
son is about to be injured, or a fire has broken out," some
delay is inherent when officers seek a blood test regardless
of whether officers are required to obtain a warrant first.
*Id.,* at 171 (opinion of ROBERTS, C. J.); see *id.,* at 153
(opinion of the Court). In the typical situation, the police
cannot test a person's blood as soon as the person is ar-
rested; police officers do not draw blood roadside. Rather,
they generally must transport the drunk-driving suspect
to a hospital or other medical facility and wait for a medi-
cal professional to draw the blood. That built-in delay
may give police officers time to seek a warrant, especially

if the suspect is brought to the hospital by an officer or emergency-response professional other than the one who applies for the warrant.

Moreover, although "the alcohol level in a person's blood begins to dissipate once the alcohol is fully absorbed, *id.,* at 152, it does so "over time in a gradual and relatively predictable manner," *id.,* at 153. Thus, even though BAC evidence is of course critical for law enforcement purposes, "the fact that the dissipation persists for some time means that the police—although they may not be able to do anything about it right away—may still be able to respond to the ongoing destruction of evidence later on." *Id.,* at 172 (opinion of ROBERTS, C. J.). For one, there may well be time for police officers to get a warrant before a person's BAC drops significantly. See *id.,* at 172–173. In addition, assuming delays do not stretch so long as to cause accuracy concerns, "experts can work backwards from the BAC at the time the sample was taken to determine the BAC at the time of the alleged offense." *Id.,* at 156 (opinion of the Court). Contrary to the plurality's fear mongering, in other words, a small delay to obtain a warrant is hardly a recipe for lawless roadways.

Meanwhile, as the Court has observed, significant technological advances have allowed for "more expeditious processing of warrant applications." *Id.,* at 154; see *Riley*, 573 U. S., at 401. In the federal system, magistrate judges can issue warrants based on sworn testimony communicated over the phone or through "'other reliable electronic means.'" *McNeely*, 569 U. S*.,* at 154 (quoting Fed. Rule Crim. Proc. 4.1). In a sizable majority of States, police officers can apply for warrants "remotely through various means, including telephonic or radio communication, electronic communication such as e-mail, and video conferencing." *McNeely,* 569 U. S., at 154; see *ibid.,* n. 4 (collecting state statutes). And the use of "standard-form warrant applications" has streamlined the warrant pro-

cess in many States as well, especially in this context. *Id.,* at 154–155. As a result, judges can often issue warrants in 5 to 15 minutes. *Id.,* at 173 (opinion of ROBERTS, C. J.). Of course, securing a warrant will always take some time, and that time will vary case to case. But "[t]here might . . . be time to obtain a warrant in many cases." *Id.,* at 172. Thus, as *McNeely* made clear, the exigency exception is appropriate only in those cases in which time is not on the officer's side.

B

The reasons the Court gave for rejecting a categorical exigency exception in *McNeely* apply with full force when the suspected drunk driver is (or becomes) unconscious.

In these cases, there is still a period of delay during which a police officer might take steps to secure a warrant. Indeed, as the plurality observes, see *ante,* at 13–14, that delay is guaranteed because an unconscious person will need to be transported to the hospital for medical attention. Such a delay occurred in Mitchell's case, even more so than it did in McNeely's. See *McNeely*, 569 U. S., at 145–146 (explaining that the police officer transported McNeely first to the police station and then to the hospital for blood testing, taking approximately 25 minutes); App. 63–64 (explaining that the police officer arrested Mitchell, drove him to the police station, placed him in a holding cell, and then transported him to the hospital and obtained a blood sample over the course of 90 minutes).

Likewise, an unconscious person's BAC dissipates just as gradually and predictably as a conscious person's does. Furthermore, because unconsciousness is more likely to occur at higher BACs, see Martin, Measuring Acute Alcohol Impairment, in Forensic Issues in Alcohol Testing 1, 8 (S. Karch ed. 2008), the BACs of suspected drunk drivers who are unconscious will presumably be higher above the legal limit—and thus remain above the legal limit for

longer—than is true for suspects who are conscious and close to sobering up. And, of course, the process for getting a warrant remains the same.

All told, the mere fact that a person is unconscious does not materially change the calculation that the Court made in *McNeely* when it rejected a categorical exigency exception for blood draws. In many cases, even when the suspect falls unconscious, police officers will have sufficient time to secure a warrant—meaning that the Fourth Amendment requires that they do so.

C

The plurality distinguishes unconscious drunk-driving suspects from others based on the fact that their unconsciousness means that they will, invariably, need urgent medical attention due to their loss of consciousness. See *ante,* at 13–14. But the need for medical care is not unique to unconscious suspects. "Drunk drivers often end up in an emergency room," whether or not they are unconscious when the police encounter them. See *McNeely*, 569 U. S., at 171 (opinion of ROBERTS, C. J.). The defendant in *Schmerber* was hospitalized, yet the Court did not, in that case or in *McNeely* decades later, promulgate a categorical exception for every warrantless blood draw. That Mitchell was hospitalized is likewise insufficient here. Even if the plurality is right that every suspect who loses consciousness will need medical care, not every medical response will interfere with law enforcement's ability to secure a warrant before ordering a blood draw. See *McNeely*, 569 U. S., at 153–154; *id.,* at 171–172 (opinion of ROBERTS, C. J.).[6]

---

[6] The plurality's new rule, in addition to requiring a defendant to prove that the officer had no time to get a warrant, also appears to require the defendant to show that his blood would not have been drawn absent law enforcement's need for a blood sample. See *ante,* at

Because the precedent is so squarely against it, the plurality devotes much of its opinion instead to painting a dire picture: the scene of a drunk-driving-related accident, where police officers must tend to the unconscious person, others who need medical attention, oncoming traffic, and investigatory needs. See *ante,* at 15. There is no indication, however, in the record or elsewhere that the tableau of horribles the plurality depicts materializes in most cases. Such circumstances are certainly not present in this case, in which the police encountered Mitchell alone, after he had parked and left his car; indeed, Mitchell lost consciousness over an hour after he was found walking along the lake. The potential variation in circumstances is a good reason to decide each case on its own facts, as *McNeely* instructs and as the Court did in *Schmerber*. See *McNeely*, 569 U. S., at 149–151, 156. The plurality instead bases its *de facto* categorical exigency exception on nothing more than a "'considerable overgeneralization,'" *id.,* at 153, as well as empirical assumptions that the parties not only lacked a chance to address, but that are

_____

16. That is, a suspect can never prevail under the new rule if the hospital staff draws his blood for its own noninvestigatory medical reasons. But, again, the relevant question is whether the evidence is likely to dissipate before the police can obtain a warrant. This particular aspect of the plurality's approach offers no help in answering that question. The plurality separately suggests that, because an unconscious person may well undergo a blood test for medical purposes regardless, its *de facto* categorical exception "could *lessen* the intrusion" of a blood draw. See *ante,* at 14, n. 8. But the fact that "people voluntarily submit to the taking of blood samples as part of a physical examination," *Birchfield* v. *North Dakota*, 579 U. S. ___, ___ (2016) (slip op., at 22), does not make the process any less intrusive when performed at the behest of law enforcement. Although one piercing is of course less cumbersome than two, the privacy interests at stake go well beyond physical discomfort. See *supra,* at 4–5; *Birchfield*, 579 U. S., at ___ (slip op., at 23); *McNeely*, 569 U. S., at 148.

also belied by Wisconsin's concession in this case.[7]

If and when a case like the one the plurality imagines does arise, however, the police officers would not be "force[d] . . . to choose between" the "rival priorities" of getting a warrant and attending to "critical health and safety needs." *Ante,* at 15. Of course, the police and other first responders must dutifully attend to any urgent medical needs of the driver and any others at the scene; no one suggests that the warrant process should interfere with medical care. The point is that, in many cases, the police will have enough time to address medical needs and still get a warrant before the putative evidence (*i.e.,* any alcohol in the suspect's blood) dissipates. And if police officers "are truly confronted with a 'now or never' situation," they will be able to rely on the exigent-circumstances exception to order the blood draw immediately. *McNeely*, 569 U. S., at 153 (some internal quotation marks omitted); *Riley*, 573 U. S., at 391. In any other situation, though—such as in Mitchell's and in many others—the officers can secure a warrant.

## V

The Fourth Amendment, as interpreted by our precedents, requires police officers seeking to draw blood from a person suspected of drunk driving to get a warrant if possible. That rule should resolve this case.

———————

[7] In addition to offering a justification for Wisconsin's warrantless search that the State itself has disavowed, the plurality also relieves all States of their burden to justify similar warrantless searches. Until now, the Court has said that "the police bear a heavy burden when attempting to demonstrate an urgent need that might justify warrantless searches." *Welsh* v. *Wisconsin*, 466 U. S. 740, 749–750 (1984); see *Coolidge* v. *New Hampshire*, 403 U. S. 443, 455 (1971). Today, the plurality turns that presumption on its head in favor of a new one that "almost always" authorizes the police to conduct warrantless blood draws even in the absence of an actual emergency. See *ante,* at 1.

The plurality misguidedly departs from this rule, setting forth its own convoluted counterpresumption instead. But the Fourth Amendment is not as pliable as the plurality suggests. The warrant requirement safeguards privacy and physical autonomy by "assuring citizens" that searches "are not the random or arbitrary acts of government agents." *Skinner* v. *Railway Labor Executives' Assn.*, 489 U. S. 602, 621–622 (1989); see *id.,* at 621.

There is no doubt that drunk drivers create grave danger on our roads. It is, however, "[p]recisely because the need for action . . . is manifest" in such cases that "the need for vigilance against unconstitutional excess is great." *Id.,* at 635 (Marshall, J., dissenting). "Requiring a warrant whenever practicable helps ensure that when blood draws occur, they are indeed justified." *McNeely*, 569 U. S., at 174 (opinion of ROBERTS, C. J.). For that reason, "the police bear a heavy burden" to justify a warrantless search like the one here based on "urgent need." *Welsh* v. *Wisconsin*, 466 U. S. 740, 749–750 (1984).

The plurality today carries that burden for a State that never asked it to do so, not only here but also in a scattershot mass of future cases. Acting entirely on its own freewheeling instincts—with no briefing or decision below on the question—the plurality permits officers to order a blood draw of an unconscious person in all but the rarest cases, even when there is ample time to obtain a warrant. The plurality may believe it is helping to ameliorate the scourge of drunk driving, but what it really does is to strike another needless blow at the protections guaranteed by the Fourth Amendment. With respect, I dissent.

# SUPREME COURT OF THE UNITED STATES

———————

No. 18–6210

———————

## GERALD P. MITCHELL, PETITIONER *v.* WISCONSIN

ON WRIT OF CERTIORARI TO THE SUPREME COURT OF WISCONSIN

[June 27, 2019]

JUSTICE GORSUCH, dissenting.

We took this case to decide whether Wisconsin drivers impliedly consent to blood alcohol tests thanks to a state statute. That law says that anyone driving in Wisconsin agrees—by the very act of driving—to testing under certain circumstances. But the Court today declines to answer the question presented. Instead, it upholds Wisconsin's law on an entirely different ground—citing the exigent circumstances doctrine. While I do not doubt that the Court may affirm for any reason supported by the record, the application of the exigent circumstances doctrine in this area poses complex and difficult questions that neither the parties nor the courts below discussed. Rather than proceeding solely by self-direction, I would have dismissed this case as improvidently granted and waited for a case presenting the exigent circumstances question.