NONPRECEDENTIAL DISPOSITION
To be cited only in accordance with Fed. R. App. P. 32.1

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois 60604**

Submitted April 2, 2020[*]
Decided April 2, 2020

**Before**

DIANE P. WOOD, *Chief Judge*

JOEL M. FLAUM, *Circuit Judge*

AMY C. BARRETT, *Circuit Judge*

No. 19-2849

| | |
|---|---|
| LARRY D. HARRIS, JR., | Appeal from the United States District |
| *Plaintiff-Appellant*, | Court for the Western District of Wisconsin. |
| | |
| *v.* | No. 17-cv-362-jdp |
| | |
| JEFFREY C. MANLOVE and | James D. Peterson, |
| AMY GUNDERSON, | *Chief Judge*. |
| *Defendants-Appellees*. | |

## O R D E R

After he assaulted and bloodied a correctional officer, Wisconsin prisoner Larry Harris consented to undergo a blood draw and testing for HIV. He did not consent, however, to have his blood tested for hepatitis, so when he found out that his blood had been tested for that purpose, he sued two prison health officials. The district court entered summary judgment for the defendants, concluding that qualified immunity shielded them from liability. We agree with the district court and affirm the judgment.

---

[*] We have agreed to decide this case without oral argument because the briefs and record adequately present the facts and legal arguments, and oral argument would not significantly aid the court. FED. R. APP. P. 34(a)(2)(C).

In early 2016, while incarcerated at Columbia Correctional Institution, Harris assaulted a correctional officer. Other officers responding to the assault reported seeing "a lot" of blood on the floor. Harris maintains that he himself did not sustain any injuries and that he did not expose the officer to any bodily fluids.

Wisconsin's Department of Corrections has a policy that a prisoner who "significantly exposes" a prison employee to blood or other bodily fluid must be tested for HIV and hepatitis B and C. *See* DAI Policy #500.20.03. If a physician certifies that the employee has been significantly exposed to blood or bodily fluids, then the inmate must consent to be tested for HIV. If the inmate refuses testing, the prison may ask the local district attorney to seek a court order to compel the test. The inmate is also asked to authorize disclosure of the test results to the medical professionals treating the exposed employee. The policy does not mention whether additional consent is needed to test for hepatitis.

Shortly after the assault, Harris was transferred to Waupun Correctional Institution, where a prison doctor, Jeffrey Manlove, was told to initiate the "significant exposure" protocol. Dr. Manlove attested that he did not recall who told him to initiate the protocol and did not know any details of the assault. He wrote an order for Harris to be tested for HIV and hepatitis B and C. Based on that order, prison nurse Amy Gunderson was instructed by her supervisor to ask Harris to consent to HIV testing and disclosure of the results. According to Harris, Gunderson told him that the assault necessitated HIV testing and that the test results would be sent to the primary-care provider of the officer whom he assaulted. Gunderson, Harris added, did not tell him about testing for hepatitis B and C.

Harris signed the consent and disclosure form. On the form, he wrote that he agreed to the disclosure of his HIV test results, but not any other category of information, like drug abuse or mental health. His blood was then drawn. The sample, however, was sent for both HIV and hepatitis testing. The tests all came back negative.

After learning that he had been tested for hepatitis in addition to HIV, Harris sued Dr. Manlove and Gunderson for misleading him about the scope of the blood draw and the intended use of the results. Had Dr. Manlove and Gunderson told him that he was going to be tested for hepatitis, he asserted, he would have refused consent (based on his belief that the testing for hepatitis is flawed). He next stated that Dr. Manlove used the "significant exposure" policy as a pretext to test him for HIV and hepatitis. Finally, he asserted that the defendants did not send the test results to the

assaulted officer's primary-care provider, further calling into question the purported justification for the blood draw.

The district court screened the complaint and allowed Harris to proceed on claims that the defendants violated the Fourth Amendment by misleading him about being tested for only HIV and by testing his blood for an improper purpose. The court also allowed Harris to proceed on a claim that the blood draw violated his due-process rights under the Fourteenth Amendment.

The defendants moved for summary judgment based on qualified immunity, arguing that no clearly established law would have put them on notice that it would be unconstitutional to test Harris's blood for hepatitis B and C, given that he already had consented to testing for HIV. The district court agreed with the defendants and entered judgment against Harris. The court concluded first that the law was unsettled on whether it is reasonable under the Fourth Amendment for prison officials to conduct warrantless, unconsented blood draws of prisoners. To the extent Harris argued that the defendants lacked a legitimate reason to conduct the blood test, the court determined that Harris presented no evidence of any improper purpose: He had not refuted Dr. Manlove's assertion that he initiated the testing protocol after being told that there was a significant-exposure incident, and the blood-test results were shared with a medical professional who was treating the officer who had been assaulted. Finally, the court concluded that inmates such as Harris had no clearly established right to due process under the Fourteenth Amendment to avoid an investigatory blood draw.

On appeal, Harris primarily challenges the district court's qualified immunity analysis on three related grounds. First, he maintains that the unconsented blood draw, which he contends was conducted without justification, was an unreasonable search under the Fourth Amendment and thus not protected by qualified immunity.

In determining whether qualified immunity applies, we look to (1) whether the defendants violated a constitutional right, and (2) whether the constitutional right was clearly established. *Pearson v. Callahan*, 555 U.S. 223, 232 (2009); *Armstrong v. Daily*, 786 F.3d 529, 537 (7th Cir. 2015). The second prong here is dispositive: Even if we accept Harris's argument at face value—that he did not give consent to the blood draw or testing, and that the defendants had no reason under Wisconsin's "significant exposure" policy to test his blood—there is no clearly established law that such conduct violates the Fourth Amendment. True, a blood draw is a search, *see Mitchell v. Wisconsin*, 139 S. Ct. 2525, 2534 (2019), but the scope of Fourth Amendment protections for

prisoners in this context remains undefined. *See, e.g.*, *Schmerber v. California*, 384 U.S. 757, 771 (1966) (warrantless attempt to secure evidence of blood-alcohol content appropriate incident to petitioner's arrest); *Sparks v. Stutler*, 71 F.3d 259, 261–62 (7th Cir. 1995) (forced catheterization of inmate for urinalysis protected by qualified immunity). The closest corollary from our circuit is an unpublished order, *Holm v. Casiana*, 759 F. App'x 500, 501–02 (7th Cir. 2019), in which we upheld the application of qualified immunity for the prison defendants because no clearly established law held that drawing blood from prisoners to test for drugs, without first obtaining a warrant, violates the Fourth Amendment. At most, the case law is unsettled over whether blood draws—conducted with or without cause—violate an inmate's rights under the Fourth Amendment.

Harris's second qualified-immunity challenge is that the *testing* of his blood, apart from the draw itself, was unreasonable under the Fourth Amendment. But he cites no case in support, and the sparse case law addressing blood tests suggests that a blood draw is inseparable from testing for purposes of the Fourth Amendment. *See United States v. Snyder*, 852 F.2d 471, 473–74 (9th Cir. 1988) ("It seems clear, however, that *Schmerber* viewed the seizure and separate search of the blood as a single event for fourth amendment purposes.").

Third, Harris argues that the district court erred by dismissing his claim based on qualified immunity because, in his view, his protected interest in bodily integrity under the Fourteenth Amendment applied to the unconsented blood draw. Harris does not point us to any case recognizing an inmate's due-process right to avoid a blood draw, nor have we found any. Although due-process claims under the Fourteenth Amendment include "matters relating to … the right to bodily integrity," *Albright v. Oliver*, 510 U.S. 266, 272 (1994), case law has not clearly established that the Fourteenth Amendment protects against warrantless blood draws (whether under a theory of bodily integrity or another). The district court, therefore, properly entered judgment in favor of the defendants based on qualified immunity.

Finally, Harris contends that the district court wrongly entered judgment for the defendants because their violation of the Department of Corrections' blood test policy creates an independent federal cause of action. Harris is mistaken, however, as a violation of a state policy by itself does not give rise to a constitutional claim. *See Tucker v. City of Chi.*, 907 F.3d 487, 494 (7th Cir. 2018).

AFFIRMED