**[J-41-2022] [MO: Mundy, J.]**
**IN THE SUPREME COURT OF PENNSYLVANIA**
**MIDDLE DISTRICT**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | : | No. 27 MAP 2021 |
| | : | |
| Appellant | : | Appeal from the Order of the |
| | : | Superior Court dated August 11, |
| | : | 2020, reconsideration denied |
| v. | : | October 14, 2020, at No. 1428 MDA |
| | : | 2017 which Reversed/Vacated the |
| | : | Judgment of Sentence of the York |
| AKIM SHARIF JONES-WILLIAMS, | : | County Court of Common Pleas, |
| | : | Criminal Division, dated April 5, |
| Appellee | : | 2017, at No. CP-67-CR-0002824- |
| | : | 2015 and Remanded for a new trial. |
| | : | |
| | : | ARGUED:  December 8, 2021 |
| | : | RESUBMITTED:  June 22, 2022 |

**CONCURRING AND DISSENTING OPINION**

**JUSTICE WECHT**                                                **DECIDED:  July 20, 2022**

By the investigating officers' own admissions, exigent circumstances plainly were absent in this case.  Accordingly, I join the Court's opinion to the extent that it rejects the Commonwealth's invocation of that constitutional exception to justify the warrantless search and seizure of Akim Jones-Williams' blood-test results in its pursuit of evidence to prove that he drove under the influence ("DUI") of a controlled substance.  I write separately to offer additional reasons why resort to exigency would be unavailing here in light of the particular treatment of controlled substances under Pennsylvania's DUI laws.

Furthermore, I respectfully dissent from the Majority's resolution of the principal legal question presented in this appeal.  We granted review to determine whether the Superior Court erred in concluding that Section 3755 of the Vehicle Code facially is

unconstitutional. That statute—which operates in conjunction with Section 1547(a) of the Vehicle Code, the so-called "implied-consent" provision[1]—obliges hospital emergency room personnel: (1) to "promptly take blood samples" of any person who "requires medical treatment in an emergency room of a hospital" resulting from "a motor vehicle accident" in which the person "drove, operated or was in actual physical control of any involved motor vehicle . . . if probable cause exists to believe a violation of [75 Pa.C.S. § ]3802 (relating to driving under the influence of alcohol or controlled substance) was involved"; (2) to transfer the sample "within 24 hours for testing to the Department of Health or a clinical laboratory licensed and approved by the Department of Health and specifically designated for this purpose"; and (3) to release the test results "upon request of the person tested, his attorney, his physician or governmental officials or agencies." 75 Pa.C.S. § 3755(a). *See Commonwealth v. Shaw*, 770 A.2d 295, 298 (Pa. 2001) ("Section 3755 and the implied consent law, 75 Pa.C.S. § 1547, comprise a statutory scheme which both implies the consent of a driver to undergo blood testing in certain

---

[1]     Section 1547(a) provides:

> **(a) General rule.**--Any person who drives, operates or is in actual physical control of the movement of a vehicle in this Commonwealth shall be deemed to have given consent to one or more chemical tests of breath or blood for the purpose of determining the alcoholic content of blood or the presence of a controlled substance if a police officer has reasonable grounds to believe the person to have been driving, operating or in actual physical control of the movement of a vehicle in violation of section 1543(b)(1.1) (relating to driving while operating privilege is suspended or revoked), 3082 (relating to driving under the influence of alcohol or controlled substance) or 3808(a)(2) (relating to illegally operating a motor vehicle not equipped with ignition lock).

75 Pa.C.S. § 1547(a).

circumstances and requires hospital personnel to release the blood test results at the request of, among others, a police officer.").

Relying upon the expressions of a plurality of Justices in *Commonwealth v. Myers*, 164 A.3d 1162 (Pa. 2017), the Superior Court held that implied consent does not serve as an independent exception to the warrant requirement under the Fourth Amendment to the United States Constitution[2] or under Article I, Section 8 of the Pennsylvania Constitution.[3] Accordingly, it reasoned that implied consent cannot support the warrantless seizure of a DUI suspect's blood or the warrantless disclosure to law enforcement of the results of any blood tests under Section 3755(a). The Majority vacates that portion of the lower court's decision on the grounds that "the record does not establish that Section 3755 applied under these circumstances." Majority Op. at 17. I disagree. The record amply supports the Commonwealth's claim that investigators obtained the results of Jones-Williams' blood test pursuant to Section 3755(a) and sought to have those results admitted at trial (over Jones-Williams' objections) on the independent grounds that Jones-Williams impliedly consented to having them turned over to investigators. Therefore, I would reach the question of the statute's constitutionality. Because the lower court correctly concluded that statutorily implied consent is not a valid

---

[2] "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. CONST. amend. IV.

[3] "The people shall be secure in their persons, houses, papers and possessions from unreasonable searches and seizures, and no warrant to search any place or to seize any person or things shall issue without describing them as nearly as may be, nor without probable cause, supported by oath or affirmation subscribed to by the affiant." PA. CONST. art. I, § 8.

exception to the warrant requirement—and thus a DUI suspect does not impliedly consent to having his blood drawn and tested, or to having those results turned over to law enforcement, simply by virtue of having driven a motor vehicle in Pennsylvania—I would affirm the Superior Court's judgment *in toto*.

## I.

The Commonwealth initially relies upon the doctrine of exigent circumstances to defend the manner in which the Newberry Township Police Department obtained the results of Jones-Williams' blood test without a warrant. The Majority correctly finds that the Commonwealth's reliance is misplaced. "Exigent circumstances are defined by a 'compelling need for official action and no time to secure a warrant.'" *Commonwealth v. Trahey*, 228 A.3d 520, 537-38 (Pa. 2020) (quoting *Missouri v. McNeely*, 569 U.S. 141, 149 (2013)). In assessing the presence or absence of exigency, a court must consider the totality of the circumstances. *See id.* at 530.

The basis for the investigators' probable cause assertion here was circumstantial evidence that Jones-Williams drove his car into the path of an oncoming train while under the influence of tetrahydrocannabinol ("THC"), the main psychoactive compound in marijuana.[4] Thus, this case does not align factually with the circumstances presented in

---

[4]     Whether the police had probable cause to believe that Jones-Williams had driven under the influence of a controlled substance is not reasonably in dispute. Two eyewitnesses, including the paramedic who rendered aid to Jones-Williams at the crash site, told investigators that they smelled burnt marijuana emanating from both his SUV and his person after he was ejected, or otherwise extricated himself, from the wreck that he caused by driving across a set of train tracks in front of an oncoming train. Another witness, the conductor, also informed an investigating officer that he saw Jones-Williams' fiancée sitting in the front passenger seat, from which we can reasonably conclude that Jones-Williams (rather than his young daughter) was driving. The lead detective, Sergeant Steven D. Lutz, gathered all of this information at the scene. Sergeant Lutz

either *Myers* or *Mitchell v. Wisconsin*, ___ U.S. ___, 139 S.Ct. 2525 (2019) (plurality), both of which involved suspicions that an unconscious driver drove under the influence of alcohol. That is significant, as we recognized in *Trahey*, because although a blood test "may be necessary" to prove DUI offenses involving controlled substances under Section 3802 of the Vehicle Code beyond a reasonable doubt, unlike alcohol-related offenses, "there is no pressing need to conduct the test" for controlled substances "within a specified time, and thus no exigency." 228 A.3d at 538.

Moreover, as the Supreme Court explained in *McNeely*, "the natural dissipation of alcohol in the bloodstream does not constitute" an exigency *per se* justifying a warrantless blood draw. 569 U.S. at 165. The same necessarily must be true of controlled substances; in fact, it may be more so with regard to certain controlled substances, like cannabinoids, given the human body's naturally slower rates of metabolism when compared with alcohol. In either scenario, some other factor must be present that demonstrates a "compelling need for official action and no time to secure a warrant." *Id.* at 149 (quoting *Michigan v. Tyler*, 436 U.S. 499, 509 (1978)). In the *Mitchell* plurality's view,

> unconsciousness does not just create pressing needs; it is *itself* a medical emergency. It means that the suspect will have to be rushed to the hospital or similar facility not just for the blood test itself but for urgent medical care. Police can reasonably anticipate that such a driver might require monitoring, positioning, and support on the way to the hospital; that his blood may be drawn anyway, for diagnostic purposes, immediately upon arrival; and that immediate medical treatment could delay (or otherwise distort the results of) a blood draw conducted later, upon receipt of a warrant, thus reducing its evidentiary value. . . .

---

then dispatched Sergeant Keith A. Farren to York Hospital in order to obtain Jones-Williams' blood for chemical testing. *See* Notes of Testimony ("N.T."), Suppression Hearing, 12/21/2015, at 68-79.

Indeed, in many unconscious-driver cases, the exigency will be *more* acute . . . .  A driver so drunk as to lose consciousness is quite likely to crash, especially if he passes out before managing to park.  And then the accident might give officers a slew of urgent tasks beyond that of securing (and working around) medical care for the suspect.  Police may have to ensure that others who are injured receive prompt medical attention; they may have to provide first aid themselves until medical personnel arrive at the scene.  In some cases, they may have to deal with fatalities.  They may have to preserve evidence at the scene and block or redirect traffic to prevent further accidents.  These pressing matters, too, would require responsible officers to put off applying for a warrant, and that would only exacerbate the delay—and imprecision—of any subsequent BAC test.

In sum, all these rival priorities would put officers, who must often engage in a form of triage, to a dilemma.  It would force them to choose between prioritizing a warrant application, to the detriment of critical health and safety needs, and delaying the warrant application, and thus the BAC test, to the detriment of its evidentiary value and all the compelling interests served by BAC limits.  This is just the kind of scenario for which the exigency rule was born—just the kind of grim dilemma it lives to dissolve.

*Mitchell*, 139 S.Ct. at 2537-38 (cleaned up; emphasis in original).  But the *Mitchell* plurality stopped short of issuing a categorical rule.  Consequently, a driver's unconsciousness alone remains an insufficient basis upon which to justify a warrantless blood draw under the totality of the circumstances.  Something more is needed.

Here, the Commonwealth asserts that the other factor supporting its exigency justification was the "chaotic situation" at the crash site.  Commonwealth's Br. at 38 (quoting N.T., Suppression Hearing, 12/21/2015, at 77).  Specifically, Jones-Williams' fiancée had died at the scene, there was evidence to collect and witnesses to interview, and traffic had to be diverted since the train was stuck at the level crossing that serves as a thruway for motor vehicles.  However, as the Majority highlights, both Sergeant Farren and Sergeant Lutz conceded at the suppression hearing that, those factors notwithstanding, they could have obtained a search warrant before proceeding to York Hospital.  *See* N.T., Suppression Hearing, 12/21/2015, at 64-66 (Testimony of Sergeant

Farren); *id.* at 83-84 (Testimony of then-Lieutenant Lutz). Those admissions are fatal to the Commonwealth's assertion of exigent circumstances.

But the absence of exigency is even more pronounced in situations, like this one, where a member of the hospital's emergency room staff preemptively draws a sample of a DUI suspect's blood without being asked to do so by law enforcement, thereby preserving any evidence of drugs or alcohol that might be in the blood at the time of extraction. *See Commonwealth v. Riedel*, 651 A.2d 135, 141 (Pa. 1994) (explaining that the exigent circumstances exception does not apply where there is "no danger that [a suspect's] blood alcohol content would evanesce because it was preserved by [a] medical purposes blood test"). Although the *Mitchell* plurality spoke favorably of permitting warrantless blood *draws* based upon the fact that unconscious patients often will have their blood taken for diagnostic purposes upon their arrival at a hospital in any event, that acknowledgement concerned only the necessity of extracting a blood sample in order to preserve evidence when there is no time to apply for a warrant. It did not speak to any subsequent testing or disclosure of the results of such testing to law enforcement without a warrant, when the exigency likely will have diminished entirely. In fact, under Section 3755(a), Pennsylvania hospitals have twenty-four hours to transfer blood samples to an accredited facility for testing, and it may take an additional day or more for results to come back.[5] The Commonwealth's sole purpose in obtaining the test results at that point will be to determine whether criminal charges are warranted. That interest is

---

[5]     It took three days for NMS Labs to receive the sealed blood chain-of-custody kit that York Hospital mailed on July 5, 2014. NMS released the results of its toxicology analysis ten days later. *See* NMS Labs Toxicology Report, 7/15/2014, at 1 (Commonwealth's Suppression Hearing Ex. 2).

not an independent exigency that justifies demanding a suspect's medical test results without first obtaining a warrant.

Even in circumstances where hospital personnel have not preemptively drawn and preserved a DUI suspect's blood, where the sole basis for probable cause is evidence demonstrating that the suspect drove under the influence of *marijuana*, as it was here, I seriously doubt that law enforcement will be unable to obtain a search warrant for a blood test before the pertinent evidence dissipates from the suspect's blood. Section 3802 of the Vehicle Code prohibits an individual from driving, operating, or being in actual physical control of the movement of a vehicle if "[t]here is in the individual's blood any amount of a: (i) Schedule I controlled substance, as defined in . . . The Controlled Substance, Drug, Device and Cosmetic Act; (ii) Schedule II or Schedule III controlled substance, as defined in" the Drug Act, "which has not been medically prescribed for the individual; or (iii) metabolite of a substance under subparagraph (i) or (ii)." *Id.* § 3802(d)(1)(i)-(iii). The Drug Act, in turn, classifies "Marihuana" as a Schedule I controlled substance. 35 P.S. § 780-104(1)(iv). Because it is unlawful to drive under the influence of *any amount* of marijuana,[6] and because it potentially can take days or weeks for THC's inactive metabolite to naturally dissipate from one's body,[7] I find it difficult to imagine a scenario

---

[6]     *See Commonwealth v. Barr*, 266 A.3d 25, 47 (Pa. 2021) (Dougherty, J., concurring and dissenting) (identifying a potential point of conflict between the Medical Marijuana Act, which legalized, among other things, certain methods of marijuana consumption for medicinal purposes, and the Vehicle Code, which prohibits driving with any amount of THC or its metabolite in one's system).

[7]     *See* NMS Labs Toxicology Report, 7/15/2014, at 2-3 ¶¶ 3-4 (explaining that, "[w]hile THC disappears from the blood rapidly, THCC [the inactive metabolite] may persist for several hours, and in heavy chronic use may be present at low concentrations for several days"). Of course, blood testing is not the exclusive means of confirming the presence of THC or its metabolite in a suspect's system. Evidence of marijuana use may

in which exigency would justify a warrantless blood draw, much less warrantless chemical testing of a preserved sample, based solely upon suspicions that a person drove a vehicle while under the influence of marijuana in violation of Pennsylvania DUI law.[8]

persist in an individual's urine for anywhere from a week to several months, depending on the frequency of use. *See* Ken Kulig, *Interpretation of Workplace Tests for Cannabinoids*, 13 J. MED. TOXICOL. 106, 109 (2017) ("The current regulatory testing for cannabinoids uses as the target analyte in urine an inactive THC metabolite that may persist for weeks or even months in chronic users after the last use.") (citing George M. Ellis, Jr., *et al.*, *Excretion patterns of cannabinoid metabolites after last use in a group of chronic users*, 38 CLINICAL PHARMACOLOGY & THERAPEUTICS 572, 527 (1985) (summarizing findings of controlled study demonstrating that the mean excretion time for chronic marijuana users under strict supervised abstinence was 27 days, while some participants took as many as 77 days for positive test results to drop below screening parameters)); Anne Smith-Kielland, *et al.*, *Urinary Excretion of 11-Nor-9-Carboxy-Δ⁹-Tetrahydrocannabinol and Cannabinoids in Frequent and Infrequent Drug Users*, 23 J. ANAL. TOXICOL. 323, 323 (1999) (for self-reported infrequent users, "low but detectable concentrations of" THC metabolite were observed more than five days beyond last documented use of marijuana "in most of the [urine] specimens analyzed"). Likewise, some studies have shown that cannabinoids may be detected in hair follicles up to two or three months after consumption. *See* Michelle Taylor, *et al.*, *Comparison of cannabinoids in hair with self-reported cannabis consumption in heavy, light and non-cannabis users*, 36 DRUG & ALCOHOL REV. 220, 225 (2017).

[8] To be clear, I do not suggest a *per se* rule for all marijuana DUI cases. I grant the possibility that "imminent medical treatment" may be rendered in such a way that DUI evidence potentially present within a suspect's blood may be affected other than by natural metabolic processes, *Mitchell*, 139 S.Ct. at 2538 (plurality) (opining that "immediate medical treatment could delay (or otherwise distort the results of) a blood draw conducted later, upon receipt of a warrant, thus reducing its evidentiary value"), the circumstances of which, of course, would need to be assessed on a case-by-case basis. But like the other justifications offered by the *Mitchell* plurality in favor of its preferred "almost always" (but not quite) exigency rule for warrantless blood draws of unconscious drivers, *id.* at 2531—which it supported with references to medical treatises, federal agency reports, clinical and law enforcement guidance, and other sources, *id.* at 2537-38 nn.5-8—the plurality's "distortion" rationale was raised in the context of *alcohol*-related DUI investigations. Indeed, the lone authority cited by the plurality with respect to distortion was a brief passage in *McNeely* in which the Supreme Court identified the "countervailing concerns" that DUI experts face *in drunk driving cases* when delays in obtaining blood draws complicate efforts to "work backwards from the [Blood Alcohol Content ("BAC")] at the time the sample was taken to determine the BAC at the time of the alleged offense," thereby "rais[ing] questions about the accuracy of the calculation." *McNeely*, 569 U.S. at 156. Notwithstanding those concerns, the Court rejected calls for

Lastly, the Commonwealth and the Pennsylvania District Attorneys Association ("PDAA") suggest that the specific concentration of THC in Jones-Williams' bloodstream is necessary to substantiate the charge of homicide by vehicle while DUI. Commonwealth's Br. at 36 n.143 (noting "the great evidentiary need for detecting the active impairing ingredient of the drug beyond a mere metabolite in order to establish criminal negligence and the DUI caused the crash"); PDAA's Br. as *Amicus Curiae* at 11 (asserting that "the degree of dissipation of marijuana in the blood stream is crucial to any

a *per se* exigency rule in DUI cases, reasoning that the half-century of technological "advances . . . that allow for the more expeditious processing of warrant applications" necessarily "are relevant to an assessment of exigency," "particularly" in drunk-driving investigations, "where the evidence offered to establish probable cause is simple," and given that "BAC evidence is lost gradually and relatively predictably." *Id.* at 154-55.

As indicated, *Mitchell* and *McNeely* both involved individuals suspected of driving under the influence of alcohol. In Pennsylvania, as in virtually every State, heightened tiers of punishment are available in alcohol-related DUI cases based upon proof that a DUI suspect's BAC level exceeded a particular measurement at a specific moment in time—so medical treatments that demonstrably distort BAC levels in unnatural ways may take on legal significance when look-back periods are at issue. When it comes to driving under the influence of marijuana (and other controlled substances) under Section 3802, however, there are no such tiers; proof that a person drove with "any amount" of such substances in his or her blood will suffice for a conviction. In that vein, I am not aware of any instances from DUI case law or clinical studies in which the kinds of emergency medical treatment typically provided to individuals rendered unconscious from car accidents have been shown to cause the complete dissipation of controlled substances from one's blood within the time that a warrant generally can be obtained with the advent of modern technologies. But even in that seemingly remote event, blood-draw evidence is not a prerequisite to conviction. The Commonwealth may still attempt to prove DUI-general impairment resulting from the use of controlled substances at trial with the same kind of relevant direct or circumstantial evidence that could have supported the blood-draw warrant application in the first place. All of this is to say that rank speculation about the effects that "imminent medical treatment" *might* have on the levels of THC or its metabolite in an unconscious DUI suspect's blood is not an exception that swallows the general rule requiring warrants for blood draws in these circumstances. In any case, here the Commonwealth has never suggested that the medical treatment Jones-Williams received upon his arrival at York Hospital's emergency room was likely to accelerate the natural dissipation of, or otherwise "distort," evidence pertaining to marijuana use that investigators suspected was in his bloodstream, so the point largely is academic.

prosecution for Homicide by Vehicle While DUI," because the Commonwealth must prove not only that the driver was under the influence of alcohol or a controlled substance, "but that this consumption was the cause of the fatality"). A person is guilty of homicide by vehicle while DUI if he "unintentionally causes the death of another person as the result of a violation of [75 Pa.C.S. § ]3802 (relating to driving under the influence of alcohol or controlled substance) and . . . is convicted of violating section 3802." 75 Pa.C.S. § 3735(a)(1). Though it may be the case that the sufficiency of the evidence needed to prove the causation element of that offense might turn upon the quantum of a controlled substance in one's system, the Commonwealth's "significant interest in obtaining [that] evidence" before its natural dissipation by itself simply does not constitute an exigent circumstance justifying the warrantless seizure or search of a person's blood or blood-test results. *Trahey*, 228 A.3d at 536; *cf. McNeely*, 569 U.S. at 165. Thus, any assertions of necessity due to natural dissipation in the particular context of a homicide-by-vehicle-while-DUI investigation or prosecution are unavailing.

## II.

## A.

Although this Court has spilled much ink over the last thirty years on the subject of implied consent, we have yet to definitively resolve its validity as a purported exception to the warrant requirement under the Fourth Amendment or Article I, Section 8 of our federal and state Constitutions, respectively.[9] We took this case to review the propriety

---

[9] *See, e.g.*, *Commonwealth v. Bell*, 211 A.3d 761, 763-64 (Pa. 2019) (upholding the "evidentiary consequence" of a DUI defendant's refusal to submit to a blood test set forth in Section 1547(e)—*i.e.*, that evidence of the refusal itself can be admitted at trial to suggest consciousness of guilt); *Myers*, 164 A.3d at 1172-81 (plurality) (opining that

of the lower court's determination that Section 3755 of the Vehicle Code constitutionally is deficient because it does not require actual, knowing, and voluntary consent before law enforcement agents may compel a person to submit to a blood draw or may obtain the results of a blood test without first obtaining a warrant for the same. Sidestepping those issues, however, the Majority contends that the lower court "could only reach that constitutional assessment having first concluded that the Commonwealth complied with Section 3755." Majority Op. at 15.

The Court reasons that we ought not address the statute's constitutionality "[b]ecause the record does not establish that Section 3755 applied under" the circumstances presented here. *Id.* at 17. In particular, the Majority highlights the fact that

> Sergeant Farren's testimony made no mention of Section 3755. Instead, the record reflects that Sergeant Farren went to the hospital with the intention of seeking [Jones-Williams'] consent. The paperwork Sergeant Farren filled out to request that the hospital transfer the blood sample to NMS specifically stated underneath his signature: "I am requesting this test in accordance with 75 Pa.S.C.A. 1547." Commonwealth's Exhibit 18. Although Lieutenant Lutz testified that he believed Sergeant Farren could

implied consent is not an independent exception to the warrant requirement)*; Shaw*, 770 A.2d at 298-99 (holding that, where hospital personnel conduct BAC testing for "independent medical purposes"—*i.e.*, not at the request of law enforcement—investigators are not statutorily authorized to obtain those results under Section 3755, and therefore violate Article I, Section 8 when they do so without a warrant); *Riedel*, 651 A.2d at 139 (holding that "where an officer has probable cause to request a blood test pursuant to 75 Pa.C.S. § 3755(a), the failure to verbalize the request shall not bar the officer from obtaining the results of a medical purposes blood test without a warrant"); *id.* at 140 ("[B]ecause the police had probable cause to request the blood test, they were entitled to obtain the results without a search warrant, regardless of who actually drew the blood."); *Commonwealth v. Kohl & Danforth*, 615 A.2d 308, 313-16 (Pa. 1992) (holding that warrantless blood draws and chemical tests undertaken pursuant to the implied-consent provision of the now-repealed Section 1547(a)(2) of the Vehicle Code violate state and federal constitutional provisions against unreasonable searches and seizures because the statute did not require investigators to establish probable cause that the driver had been driving under the influence); *Commonwealth v. Eisenhart*, 611 A.2d 681, 683-84 (Pa. 1992) (holding that a conscious driver has a statutory right to revoke his implied consent under Section 1547(b) of the Vehicle Code).

> obtain the blood under Section 3755, that subjective assessment alone does not establish compliance with the statute. *See, Trahey, supra* n.5. Most importantly, an objective analysis of the evidence reveals that the record is silent as to why the hospital drew [Jones-Williams'] blood prior to Sergeant Farren's arrival. In the absence of any facts that the blood was taken pursuant to Section 3755, it cannot be said that the Commonwealth proved adherence with the requirements of the statute. *See Shaw*, 770 A.2d, at 623 (finding Section 3755 inapplicable because it "is not a case where a blood sample has been taken pursuant to Section 3755.").

*Id.* at 16-17 (footnote omitted). The Majority further explains that "the trial court only provided a *post hoc* assessment of Section 3755 in its Rule 1925(a) opinion, long after the suppression motion had been denied based upon its finding of exigent circumstances." *Id.* at 17. Because that finding "was legally incorrect, the Superior Court could have reversed the denial of suppression for that reason alone without its further assessment of Section 3755." *Id.* I respectfully disagree.

As a threshold matter, this Court long has regarded Section 1547 and Section 3755 as coordinate components of a unitary implied-consent "scheme." *See Shaw*, 770 A.2d at 298; *Riedel*, 615 A.2d at 139-40 ("Together, these sections comprise a statutory scheme that implies the consent of a driver to undergo chemical blood testing under particular circumstances."); *id.* at 139 (referring to Section 3755(a) as the "emergency room counterpart" of Section 1547). Indeed, we have highlighted the fact that the two provisions "were originally part of the same section, which was subsequently amended to the current scheme." *Riedel*, 615 A.2d at 140 n.2 (citing Law of June 17, 1976, P.L. 162, No. 81, § 1, *amended by* Law of Dec. 15, 1982, P.L. 1268, No. 289, §§ 5 and 11).

We also have clarified that "the failure to verbalize [a] request" for a blood test under Section 3755(a) "shall not bar [an] officer from obtaining the results of a medical purposes blood test without a warrant." *Id.* at 141. That is because "the litmus test under

section 3755 is *probable cause* to request a blood test, not the request itself." *Id.* at 140 (emphasis in original). Thus, so long as police have "probable cause to request the blood test" based upon a suspected violation of the DUI laws, we have held that they statutorily are "entitled to obtain the results [of that test] without a search warrant, *regardless of who actually withdrew the blood*" or for what purpose. *Id.* (emphasis added).

The Majority acknowledges that Sections 1547 and 3755 are part of the same statutory scheme, but it implies that the *Myers* Court somehow abrogated the foregoing passages from *Riedel* by noting "that the authority of these statutes are not interchangeable." Majority Op. at 16 n.6 (citing *Myers*, 164 A.3d at 670 n.14). I differ with that assessment. Footnote fourteen in *Myers* was prompted by the Commonwealth's assertion that an unconscious driver has no right to refuse a blood test under Section 1547, which hung upon a statement in *Riedel* that the Court "w[ould] not reformulate the law to grant an unconscious driver or driver whose blood was removed for medical purposes the right to refuse to consent to blood testing." *Riedel*, 651 A.2d at 142. The footnote went on to distinguish Myers' case from Riedel's, and in so doing laid bare the Commonwealth's "selective reliance upon [that] decontextualized sentence." *Myers*, 164 A.3d at 670 n.14.

Notably, Myers sought to vindicate his statutory right of refusal under Section 1547(b)(1) because, although unconscious, he was under arrest when his blood was drawn by hospital personnel, his blood was not drawn for medical purposes, and he believed it would not have been drawn at all but for investigators' intercession. Riedel, by contrast, was neither unconscious nor under arrest when his blood was drawn, and his blood was taken and tested by the hospital for medical purposes before investigators

submitted their request for the test results. The Court rejected Riedel's claim that the statutory right of refusal in Section 1547 should apply to blood draws taken for medical purposes or under Section 3755, reasoning that Riedel wasn't under arrest. While the Court just as easily could have reached the same result on statutory construction grounds given that Section 3755 does not contain a right-to-refuse component, in *Myers* we found *Riedel*'s holding to be "entirely consistent with" Section 1547(b)(1)'s plain language, as "the critical fact" under that provision "is not whether the motorist is conscious, but whether the motorist is under arrest." *Id.* Because Myers was denied an opportunity to refuse blood testing while under arrest, albeit in an unconscious state, the Commonwealth's resort to *Riedel* was misplaced.

Significantly, the constitutionality of Section 3755 was not before us in *Myers*, and our brief discussion of its mechanics vis-à-vis Section 1547, whose construction was directly under consideration, in no way resolved the present dispute. At issue here is whether the same facts that give law enforcement agents probable cause to believe that a suspect has driven under the influence of drugs or alcohol, thus enabling them to seek a blood draw under the latter provision, also authorize investigators to request that hospital personnel transfer blood samples for testing under the former, regardless of the samples' provenance. *Riedel* and *Shaw* make clear that facts giving rise to probable cause under Section 1547 suffice without more under Section 3755. In that sense, the probable cause determination *is* interchangeable, and such a showing by investigators is a prerequisite common to both provisions, which present alternative pathways for obtaining blood test results. *Myers* did not upset that understanding.

The Majority also makes hay of the bare fact that "Sergeant Farren's testimony made no mention of Section 3755," and infers from that omission an intent to seek Jones-Williams' actual consent for a blood draw. Majority Op. at 16. In drawing that inference, the Majority neglects the fact that Sergeant Farren's supervisor explicitly testified that he sent Sergeant Farren to the hospital to obtain a legal blood draw in accordance with that very provision:

| | |
|---|---|
| Commonwealth: | In terms of obtaining a search warrant in this particular matter, when you said that you were proceeding to request a legal blood draw was obtained [*sic*], what was the theory behind requesting that blood under a legal blood draw theory? |
| Sergeant Lutz: | I believe the vehicle code allows you to have a legal blood drawn [*sic*]. I believe it's underneath 3755. I'm not quite sure. But it allows the Commonwealth to, if they have probable cause, to have a legal blood drawn [*sic*]. |
| Commonwealth: | And was that specifically the section you were proceeding under? |
| Sergeant Lutz: | That was the section that I was using for Officer Farren to have legal blood drawn. |
| Commonwealth: | And you never pursued any other theories such as a search warrant; correct? |
| Sergeant Lutz: | I did apply for a search warrant after the fact for medical records. |

N.T., Suppression Hearing, 12/21/2015, at 84. This line of testimony undermines the foundation upon which the Majority elects not to address the critical question of which we granted review. The Majority deems this portion of Sergeant Lutz's testimony a "subjective assessment" that "alone does not establish compliance with" Section 3755 in the face of "an objective analysis" that the record is silent as to York Hospital's rationale

for drawing Jones-Williams' blood.  Majority Op. at 16-17.  But as noted above, the effect of investigators' probable cause determinations upon their authority to obtain blood test results under either statutory provision is the same, never mind why they were drawn. And here the evidence objectively establishes that investigators had probable cause to believe Jones-Williams had driven under the influence of marijuana when Sergeant Farren requested that the blood samples be transferred for testing.

Additionally, in likening this case to *Shaw*, the Majority misapprehends the relevant portion of that Court's analysis, suggesting that Section 3755 was "inapplicable" in *Shaw* because the blood sample was not *taken* pursuant to the dictates of that provision.  *Id.* at 17.  But *Shaw* makes clear that the statute was inapplicable because the hospital already had *tested* the blood for independent medical purposes.  *See Shaw*, 770 A.2d at 299 ("[As Shaw's] BAC *test* was not *conducted* pursuant to Section 3755(a), the release of the result of the BAC test at the request of Trooper Hershey was not authorized by Section 3755(a), nor is there any other statutory basis for releasing the result.") (emphases added).  In the absence of an alternative "statutory basis" for obtaining the *test results* without a warrant, "the release of the result of [Shaw's] BAC test . . . to Trooper Hershey without a warrant and in the absence of exigent circumstances, violated Article I, Section 8 of the Pennsylvania Constitution."  *Id.* at 299.

In light of these pronouncements, I reiterate that whether York Hospital drew Jones-Williams' blood for "independent medical purposes" or in adherence to "the abstract requirement that 'probable cause exists to believe'" that he violated the DUI laws,

*id.* at 298, is irrelevant as far as Section 3755 is concerned.[10] The presence or absence of the hospital's reasons for drawing his blood on this record is of no moment. What matters is that, after drawing and preserving the blood samples, the hospital did not transfer them for testing until Sergeant Farren went to the hospital's laboratory, requested that Jones-Williams' blood be tested for criminal investigative purposes, and completed the required paperwork to effectuate the samples' transfer to an accredited lab. *See* N.T., Suppression Hearing, 12/21/2015, at 59 ("I actually responded up to the laboratory and filled out the proper form for the NMS Labs and made the request there because the blood was already drawn.").

Moreover, it is immaterial that the standard form that Sergeant Farren submitted included the pre-typed statement, "I am requesting this test in accordance with 75 Pa.C.S.A. § 1547," NMS Labs Analysis Requisition and Property Receipt / Chain of Custody, 7/5/2014 (Commonwealth's Suppression Hearing Ex. 1), which apparently is a requirement that the lab itself mandates. *See* N.T., Suppression Hearing, 12/21/2015, at 60 ("Q. In terms of doing this, filling out those forms, does the lab reporting also require you as part of their paperwork to go ahead and specifically express to them that you are requesting this pursuant to a police investigation? A. Correct."). Notwithstanding

---

[10] The *Shaw* Court shrewdly observed that "Section 3755(a) is, to say the least, inartfully drafted. For some vague and curious reason, the legislature has required a probable cause determination without specifying who is to make such determination, or how such an abstract requirement is to be met." *Shaw*, 770 A.2d at 298 n.3. While the statute is clear that "[t]est results shall be released upon request of . . . government officials or agencies," it doesn't expressly authorize law enforcement to *request* anything else. 75 Pa.C.S. § 3755(a). To the extent Section 3755 provides any basis for law enforcement agents to direct hospital personnel to "promptly" draw a person's blood and timely transmit it for testing, those powers are not clearly delineated in the statute, but instead have been inferred by the courts. *See Shaw*, 770 A.2d at 298 n.3 (outlining alternative means by which Section 3755(a) might be satisfied).

whatever extraneous declarations the lab may have added to the standard form, per *Shaw*, all that Section 3755 evidently required of Sergeant Farren when he submitted his request for a toxicology analysis of the preserved blood sample was that he possess probable cause to believe that Jones-Williams had violated the DUI law. *See Shaw*, 770 A.2d at 298 n.3; n. 10, *supra*. The record inarguably supports that probable cause determination.

For that reason, I agree with the Superior Court's conclusion that the Commonwealth complied with Section 3755 regardless of whether the hospital had extracted Jones-Williams' blood without being asked to do so by law enforcement. *Commonwealth v. Jones-Williams*, 237 A.3d 528, 536 n.13 (Pa. Super. 2020) (citing *Commonwealth v. Seibert*, 799 A.2d 54, 64 (Pa. Super. 2002) (explaining that an "officer is entitled to the release of [chemical] test results" if he "determines there is probable cause to believe a person operated a motor vehicle under the influence . . . and requests that hospital personnel withdraw blood" even though "medical staff previously drew the blood and a request by the police . . . came after the blood was drawn")); *see also Commonwealth v. Hipp*, 551 A.2d 1086, 1091 (Pa. Super. 1988) (*en banc*) (holding that a police officer had probable cause under Section 1547(a) to request a blood draw, and that hospital personnel complied with Section 3755(a) when they volunteered the results of a blood test that had been performed for medical purposes); *accord Commonwealth v. Barton*, 690 A.2d 293, 298 (Pa. Super. 1997).

**B.**

With all of these considerations in mind, it is plain to me from this record that the investigators complied with the bare requirements of Section 3755, and that the

Commonwealth has, at all stages of this case, proceeded under the belief that the Vehicle Code's bipartite implied-consent scheme provides an independent basis for excusing the investigators' failure to obtain a search warrant for the results of Jones-Williams' blood test, separate and apart from any claim of exigency.

That the "the trial court only provided a *post hoc* assessment of Section 3755 in its Rule 1925(a) opinion, long after the suppression motion had been denied," Majority Op. at 17, is another irrelevancy that the Majority offers up to avoid addressing the statute's constitutionality. The Commonwealth invoked both implied consent and exigency as alternative grounds for defeating Jones-Williams' suppression motion. The trial court chose to address only the latter. I would not fault that court for taking that approach in the interest of judicial economy and to avoid the thornier constitutional question—though, as the court candidly admitted later, it erroneously excused the warrantless seizure on exigency grounds (a concession with which this Court agrees today), so its self-restraint was for naught. Nor would I punish the Commonwealth for the trial court's miscalculation by declining to address the merits of its other preserved claim at this stage.

For the sake of completeness, I note the following relevant events. Jones-Williams challenged the constitutionality of Section 1547 and Section 3755, both facially and as-applied, in his pre-trial suppression motion. Omnibus Pre-Trial Motion, 10/26/2015, ¶¶ 25-54; Brief in Support of Omnibus Pre-Trial Motion, 1/29/2016, at 29-39. The Commonwealth defended the constitutionality of that scheme from both avenues of attack. Commonwealth's Mem. of Law in Opposition to Defendant's Omnibus Pretrial Motion, 1/29/2016, at 24-27. Jones-Williams then supplemented his challenge to the statutes' constitutionality with more than twenty pages of additional argument. Supp. Br.

in Support of Omnibus Pre-Trial Motion, 2/29/2016, at 1-21. The Commonwealth responded in kind. Commonwealth's Supp. Mem. of Law in Opposition to Defendant's Omnibus Pretrial Motion, 4/20/2016. In its opinion rejecting Jones-Williams' suppression motion, the trial court summarized the preserved constitutional challenges to the implied-consent scheme, but only addressed the merits of the exigency issue. Opinion, Bortner, J., 4/27/2016, at 7-11.

Following his conviction, Jones-Williams sought post-sentence relief, which was denied. He then appealed and filed a Rule 1925(b) statement reiterating his facial and as-applied constitutional challenges to Section 3755, among other claims. Statement of Matters Complained of on Appeal in Accordance with Pa.R.A.P. 1925(b), 10/5/2017, at ¶¶ 5.1-5.2. He supplemented that filing the next day to bring to the court's attention our *per curiam* Order in *Commonwealth v. March*, 172 A.3d 582 (Pa. 2017), issued just three days earlier, in which we vacated a published Superior Court decision rejecting a constitutional challenge to Section 1547 and remanded for reconsideration in light of *Myers*.[11] Supp. to Rule 1925(b) Statement, 10/6/2017. In its Rule 1925(a) opinion, the trial court conceded that it had erred in finding exigent circumstances and it asked the Superior Court to vacate Jones-Williams' homicide-by-vehicle-while-DUI conviction while affirming the remainder of his judgment of sentence. Opinion, Bortner, J., 4/13/2018, at 12-13. As for the constitutional challenge to Section 3755, the court once again summarized but failed to resolve the preserved facial challenge on its merits, *id.* at 13-17; however, it rejected Jones-Williams' as-applied challenge, concluding that the

---

[11]    The Superior Court was unable to reconsider that issue on remand in *March* because the Commonwealth ultimately withdrew its appeal of the suppression court's grant of relief.

Commonwealth met its burden of proving that Sergeant Farren had probable cause to request the blood draw "and that York Hospital operated under a perceived duty of § 3755." *Id.* at 20. The Superior Court agreed with the trial court that exigency was lacking and that the Commonwealth had complied with its statutory obligations in obtaining Jones-Williams' blood test results. *Jones-Williams*, 237 A.3d at 536-37, 544-46. The panel then reached the preserved issue that Jones-Williams had pursued in vain in the trial court and found Section 3755 facially unconstitutional. *Id.* at 542.

The Majority concludes that the Superior Court's exigency analysis was enough to resolve the case and that it never should have reached the constitutional issue. Majority Op. at 17. The Majority is wrong. Because the Commonwealth possessed probable cause to believe that Jones-Williams had driven under the influence of marijuana when Sergeant Farren requested his blood test results pursuant to Section 3755, both parties were, are, and always have been entitled to a merits resolution of Section 3755's facial constitutionality. That issue has been preserved and briefed at every stage of this case going back to Jones-Williams' October 26, 2015 omnibus pretrial motion. Exigency and consent are constitutionally distinct exceptions to the warrant requirement. The resolution of one does not *ipso facto* resolve the other. Likewise, the trial court's resolution of the as-applied challenge in the Commonwealth's favor did not also resolve the facial challenge. If the meticulous procedural survey presented above isn't enough to demonstrate that the constitutionality of Section 3755 is a live issue, I frankly don't know what would be. But if the Majority is unwilling to reach that purely legal question without some initial consideration by the trial court, then, at the very least, the Commonwealth deserves the opportunity to make its case to that court that Jones-Williams' homicide-by-

vehicle-while-DUI conviction need not be vacated because consent constitutionally can be implied by statute and was in this case. After all, were it not for the trial court's confessed error and repeated sidestepping of the preserved facial constitutional question, we may have avoided this impasse altogether.

Because the constitutionality of these procedures is squarely before us, I would resolve that question now in unmistakable terms: For all the reasons expressed by the *Myers* plurality, statutorily implied consent cannot serve as an independent exception to the warrant requirement, and any criminal statutory scheme purporting to authorize searches or seizures upon that basis runs afoul of both state and federal constitutional protections. *See Myers*, 164 A.3d at 1172-81.

To be sure, neither this Court nor the United States Supreme Court ever has held that statutorily implied consent justifies a warrantless search or seizure that otherwise would violate the United States or Pennsylvania Constitutions. Although the Supreme Court in *Birchfield v. North Dakota*, 579 U.S. 438 (2016), noted that its "prior opinions have referred approvingly to the general concept of implied-consent laws that impose *civil penalties* and *evidentiary consequences* on motorists who refuse to comply"—and admonished that nothing it said in that case "should be read to cast doubt on them," *id.* at 476-77 (citations omitted; emphasis added)—the Court cautioned that "[t]here must be a limit to the consequences to which motorists may be deemed to have consented by virtue of a decision to drive on public roads." *Id.* at 477. Among the things that exceed those limits are "a State['s] . . . insist[ence] upon an intrusive blood test," and the "impos[ition] of criminal penalties on the refusal to submit to such a test." *Id.*; *see also Bell*, 211 A.3d at 792 (Wecht, J., dissenting) ("[E]very time that the *Birchfield* Court spoke

of 'implied consent,' it referred to these statutory *consequences* of refusal, not to an exception to the Fourth Amendment's warrant requirement. In this regard, statutorily implied consent provisions should be regarded as mandates that a motorist cooperate with a *valid* search, not as mechanisms to allow circumvention of the requirements of the Fourth Amendment.") (emphasis in original).

Perhaps signaling its growing discomfort with more expansive notions of implied consent than those referred to favorably in *Birchfield*, the *Mitchell* plurality intimated that there is *less* to the Court's past references of approval regarding "the general concept of implied-consent laws" than meets the eye. *See Mitchell*, 139 S.Ct. at 2552 (plurality) (quoting *Birchfield*, 579 U.S. at 476). It explained that the Court's previous "decisions have *not* rested on the idea that these [implied-consent] laws do what their popular name might seem to suggest—that is, create actual consent to all the searches they authorize." *Id.* at 2551 (emphasis added). Rather, those decisions were based upon "the precedent regarding the specific constitutional claims in each case, while keeping in mind the wider regulatory scheme developed over the years to combat drunk driving. That scheme is centered on legally specified BAC limits for drivers—limits enforced by the BAC tests promoted by implied-consent laws." *Id.*

The *Mitchell* plurality then went out of its way to avoid discussing the question that it had accepted for review, namely, whether a provision of Wisconsin's DUI law that expressly "deemed" unconscious motorists to have consented to warrantless blood testing complied with the requirements of the Fourth Amendment. Instead, in resolving the case, the plurality focused exclusively upon exigent circumstances, even though Wisconsin prosecutors hadn't relied upon that exception, the state courts hadn't

addressed it, and the parties hadn't briefed its applicability before the Court. *See Mitchell*, 139 S.Ct. at 2551 (Gorsuch, J., dissenting) ("We took this case to decide whether Wisconsin drivers impliedly consent to blood and alcohol tests thanks to a state statute. That law says that anyone driving in Wisconsin agrees—by the very act of driving—to testing under certain circumstances. But the Court today declines to answer the question presented. Instead, it upholds Wisconsin's law on an entirely different ground—citing the exigent circumstances doctrine," which "neither the parties nor the courts below discussed."). As far as implied consent's continuing viability is concerned, I find the *Mitchell* plurality's bait-and-switch in this regard to be telling.

Oddly enough, the Commonwealth suggests here that *Mitchell* actually supports the constitutionality of Section 3755 "as an implied-consent statute that codifies the exigent circumstances test." Commonwealth's Br. at 44; *see also id.* at 46 ("Section 3755(a) is 'codified exigency' and as such is facially constitutional."). The Wisconsin Supreme Court rejected this very argument just last year in *State v. Prado*, 960 N.W.2d 869 (Wis. 2021). In that case, the Court resolved the issue that the *Mitchell* Court had ducked, holding that the Wisconsin DUI statute's "incapacitated driver provision cannot be constitutionally enforced under any circumstance and is unconstitutional beyond a reasonable doubt." *Id.* at 878. Addressing the unstable legal foundation upon which the statute's implied-consent provision stood, the *Prado* Court offered a compelling rationale equally applicable to our present circumstances. It reasoned:

> The State's essential argument in this case boils down to an assertion that the incapacitated driver provision is constitutional because exigent circumstances may have been present. This argument conflates the consent and exigent circumstances exceptions to the warrant requirement. The incapacitated driver provision of the implied consent statute is not focused on exigent circumstances. As the moniker "implied consent"

connotes, the statute addresses consent, which is an exception to the warrant requirement separate and apart from exigent circumstances.

Thus, the determination of whether there were exigent circumstances does not involve any application of the incapacitated driver provision. In other words, if the State relies on exigent circumstances to justify a search, it is not relying on the statute. Searches of unconscious drivers may almost always be permissible as the State contends, but then they are almost always permissible under the exigent circumstances exception to the warrant requirement pursuant to the *Mitchell* plurality, not under the statute.

In the context of warrantless blood draws, consent "deemed" by statute is not the same as actual consent, and in the case of an incapacitated driver the former is incompatible with the Fourth Amendment. Generally, in determining whether constitutionally sufficient consent is present, a court will review whether consent was given in fact by words, gestures, or conduct. This inquiry is fundamentally at odds with the concept of "deemed" consent in the case of an incapacitated driver because an unconscious person can exhibit no words, gestures, or conduct to manifest consent.

Under the incapacitated driver provision, we ask "whether the driver drove his car" and nothing more. The statute thus reduces a multifaceted constitutional inquiry to a single question in a manner inconsistent with this court's precedent regarding what is constitutionally required to establish consent.

The constitution requires actual consent, not "deemed" consent. Indeed, consent for purposes of a Fourth Amendment search must be "unequivocal and specific." Consent that is "deemed" by the legislature through the incapacitated driver provision is neither of these things. It cannot be unequivocal because an incapacitated person can evince no words, gestures, or conduct to demonstrate such an intent, and it is generalized, not specific.

Further, a person has a constitutional right to refuse a search absent a warrant or an applicable exception to the warrant requirement. The incapacitated driver provision does not even afford a driver the opportunity to exercise the right to refuse such a search. Under the statute, the constitutional right to refuse a warrantless search is transformed into simply a matter of legislative grace. Such a transformation is incompatible with the Fourth Amendment.

*Id.* at 879-80 (citations, footnote, and paragraph designations omitted). Added to the bevy

of decisions from other state courts of last resort cited by the *Myers* plurality, implied

consent's prospects as an independent exception to the warrant requirement simply are untenable.

As the *Prado* Court cogently explained, "[a] statutory *per se* exception is antithetical to the case by case determination *McNeely* mandates." *Id.* at 880. Consent and exigency are two distinct exceptions to the warrant requirement, and there is no authority for the proposition that Pennsylvania's implied-consent statutory scheme codified the exigent circumstances exception. If the Commonwealth wishes to rely upon the statute to justify its warrantless seizure of Jones-Williams' blood-test results, then it is relying upon consent, not exigency. Nor is it relevant, as the Commonwealth suggests in contrasting this case with *Myers*, that Jones-Williams wasn't formally under arrest when his blood was drawn. Commonwealth's Br. at 47. It cannot be the case that police officers can do an end-run around the statutory right-of-refusal simply by declining to arrest a suspect *before* asking hospital staff to draw and test his blood, and then attempt to justify the warrantless seizure and search on the grounds that the suspect was not under arrest at the time his blood was drawn and tested. In grasping at whatever argument it can in hopes of saving the statute, the Commonwealth protests too much.

That said, *Myers* did not go as far as the Defender Association *amici* suggest it did either. *See* Phila. Defender Assoc. & Pa. Assoc. of Criminal Defense Lawyers' Br. as *Amici Curiae* at 19 (asserting that "*Myers* correctly decided the constitutional issue, rejecting an implied consent statute as a basis for sustaining a warrantless search"). It is true that five Justices in *Myers* agreed that Section 1547 was unconstitutional, but the two camps relied upon very different rationales. While the plurality would have held that the statute's implied-consent provision did not constitute an independent exception to the

warrant requirement and, in the absence of such an exception, that the warrantless blood-draw performed upon Myers without his actual consent was unconstitutional, Chief Justice Saylor and then-Justice, now Chief Justice, Baer found the statute facially unconstitutional because the "consent" that it "implied" was predicated upon enhanced penalties for refusal, which *Birchfield* expressly prohibited.  *See Bell*, 211 A.3d at 773 (acknowledging that a majority of the *Myers* Court "also held, albeit without complete agreement as to reasoning, that a warrantless blood draw from an unconscious DUI suspect violates the Fourth Amendment") (citing *Myers*, 164 A.3d at 1173-82 (plurality); *id.* at 1183-84 (Saylor, C.J., concurring)).

Unlike Section 1547, however, Section 3755 neither expressly contemplates a right to refuse a blood draw or a toxicology test, nor does it contain a penalty enhancement.  Nor does it merely *authorize* warrantless blood draws, as Section 1547 does.  Rather, Section 3755 *mandates* that an "emergency room physician or his designee *shall* promptly take blood samples . . . and transmit them . . . for testing" in every case where "the person who drove, operated or was in actual physical control of the movement of any" motor vehicle involved in an accident presents in the emergency room for medical treatment for injuries resulting from that accident—so long as "probable cause exists to believe" that Pennsylvania's DUI laws were violated.  75 Pa.C.S. § 3755(a) (emphasis added).  In putting the onus on hospital personnel to draw a DUI suspect's blood, transfer it for testing, and release the test results to law enforcement upon request—no matter the circumstances and without regard to even a *conscious* patient's objections—Section 3755 is a different beast entirely.

Among the statute's other problematic features—and notwithstanding the *Shaw* Court's supposition on this point, *see Shaw*, 770 A.2d at 298 n.3; n. 10, *supra*—it is not clear *who* is responsible for making the probable cause determination that triggers the hospital's obligations under the statute. Nor is there any mechanism for an independent assessment of that determination by a neutral and detached magistrate, as there would be if a warrant had been sought. Additionally, the statute fails meaningfully to cabin the authority of "emergency room physician[s] or [their] designee[s]" to subject an individual to a warrantless blood draw against his will—whether or not at the direction of law enforcement—or to disclose the results of a blood test to "governmental officials or agencies" who lack a warrant for the same. 75 Pa.C.S. § 3755(a). As far as I am aware, medical and nursing schools generally do not instruct their students on the finer points of search-and-seizure law.

Nonetheless, given Section 3755's "abstract" probable-cause trigger, if the requisite cause "exists to believe" a DUI offense "was involved," someone in that emergency room must "promptly" subject *any* driver who requires emergency medical treatment as a result of a motor vehicle accident to a blood draw and submit that blood sample to the Department of Health or a Department-approved clinical lab for chemical testing, even if such a test is not medically necessary. *Id.* And if the person(s) who drove the vehicle(s) involved in the accident "cannot be determined," then "all injured occupants who were capable of" driving must be tested, *id.*, effectively extending the Vehicle Code's implied-consent regime to unwitting passengers as well as drivers. While the extent to which emergency room personnel across the Commonwealth are undertaking these sorts of probable cause determinations of their own volition remains unclear, the sheer breadth

of the statute's potential reach is staggering. As the late Justice Scalia might have quipped, "I doubt that the proud men who wrote the charter of our liberties would have been so eager to open their" veins "for royal inspection." *Maryland v. King*, 569 U.S. 435, 482 (2013) (Scalia, J., dissenting).

But Section 3755's breathtaking novelty should make no difference in how this Court ultimately resolves the question of its constitutionality. As noted above, this Court has made clear that Section 3755 and Section 1547 operate hand in glove. In other words, with regard to the statutory scheme's implied-consent function, as goes one provision, so goes the other. Because neither provision requires actual, knowing, and voluntary consent before law enforcement agents may obtain a blood draw or chemical test results, *any* blood sample drawn, tested, or released to agents of law enforcement at their request and without a warrant under the statutes' auspices is patently unreasonable. As such, each of these statutes is unconstitutional on its face. *See Myers*, 164 A.3d at 1180 (plurality) ("Like any other search premised upon the subject's consent, a chemical test conducted under the implied consent statute is exempt from the warrant requirement only if consent is given voluntarily under the totality of the circumstances.").

Pennsylvanians have a reasonable expectation of privacy in their medical records, one that protects those records from warrantless governmental inspection. That right is safeguarded not only by the Fourth Amendment to the United States Constitution but also by Article I, Section 8 of the Pennsylvania Constitution. *Riedel*, 651 A.2d at 138; *Shaw*, 770 A.2d at 299. To be considered reasonable, any search or seizure of those records must be supported by probable cause and either accompanied by a warrant or the circumstances must be such that the search falls within an exception to the warrant

requirement. *Bell*, 211 A.3d at 769-70. One such exception is proof that the individual whose person or property is to be searched or seized by law enforcement voluntarily has acceded to those requests. Section 3755 is part and parcel of a statutory scheme that deems drivers to have consented to both chemical testing and the disclosure of test results to law enforcement simply by virtue of having driven on the Commonwealth's roads. But statutorily "implied consent" contravenes the time-honored constitutional principles that protect individual liberty by ensuring any waiver of one's rights is done knowingly and voluntarily. It therefore cannot serve as an independent exception to state or federal constitutional commands. Rather than address Section 3755's apparent deficiencies head-on, the Majority kicks the proverbial can a little further down the road by opting instead to vacate the Superior Court's holding, which turned upon the views expressed by the *Myers* plurality. Because I would reach the principal constitutional question before us and resolve it once and for all by affirming the lower court's eminently correct determination, I respectfully dissent.

Justice Donohue and Justice Dougherty join this concurring and dissenting opinion.